**Jerry Franklin PARKS, Petitioner,**

v.

**Dr. P. J. CICCONE, Respondent.**

**No. 16606–4.**

United States District Court
W. D. Missouri, W. D.

March 8, 1968.

---

Michael T. White, Sheridan, Sanders, Millin, Peters, Carr & Sharp, Kansas City, Mo., for petitioner.

Calvin K. Hamilton, U. S. Atty., Charles E. French, Asst. U. S. Atty., Kansas City, Mo., for respondent.

## MEMORANDUM

ELMO B. HUNTER, District Judge.

Petitioner is presently confined at the Federal Medical Center, Springfield, Missouri. On June 16, 1967, he was committed pursuant to 18 U.S.C. § 4246, by the United States District Court for the Western District of Kentucky. Petitioner is charged with violation of the Dyer Act.

On September 15, 1967, Petitioner filed a petition for *habeas corpus,* contending that he was being denied numerous constitutional rights by the Medical Center and its personnel. His original petition was supplemented by additional documents, and was finally set for hearing for October 29, 1967, on those matters upon which a hearing was required. On October 12, 1967, with the consent of Petitioner, Mr. Michael T. White, a well-qualified Kansas City attorney, was appointed by the Court to represent Petitioner, and to assist him in all respects.

The evidentiary hearing commenced on Tuesday, October 29, 1967, and, with the consent of all parties, was continued from that date to February 26, 1968, for the purpose of giving all parties additional opportunity to prepare concerning certain contentions. On February 26, 1968, the evidentiary hearing was resumed, and at the close thereof, the case was taken under advisement by the Court.

The following are the contentions of Petitioner: I. Petitioner's right of freedom of speech, as guaranteed by the First Amendment, was violated in that: (a)—Petitioner was limited to possessing 15 letters; (b)—Petitioner was limited to corresponding with no more than 12 approved persons; (c)—Petitioner's mail was censored. II. Petitioner was forced into involuntary servitude, contrary to Amendment XIII, in that although an unconvicted person, he was required to perform work; was not paid an adequate wage therefor; and was not permitted to do the type and amount of work that he desired. III. Petitioner was unconstitutionally limited in his right to keep books, magazines, and other written material, by the arbitrary rules of the Medical Center. IV. Petitioner was unconstitutionally deprived of his right to purchase and have certain magazines and related material. V. Petitioner was unconstitutionally punished for resorting to the courts in such matters as the filing of writs and other legal papers, and the making of court appearances. VI. Petitioner was wrongfully prohibited from carrying on commercial activities while an inmate, and particularly leathercraft, mail order business, and similar matters. VII. Petitioner was wrongfully denied the use of a typewriter in the preparation of legal documents and correspondence. VIII. Petitioner was wrongfully denied medical treatment and

medical examination. IX. Petitioner, although an unconvicted person, was unconstitutionally treated the same as a convicted person by the medical institution and its personnel. X. Petitioner's approved list of correspondents was wrongfully subjected to police investigation, including police visits to the people named thereon. XI. Petitioner was unconstitutionally denied the right to receive legal help and legal assistance from fellow inmates of the institution. XII. Petitioner was the victim of unlawful search and seizures of certain books and letters possessed by him.

While many of the above contentions lack evidentiary support, the Court will endeavor to deal with them individually, after first stating legal principles that may be involved.

Congress has placed the management of federal penal and certain medical type institutions in the executive department of the United States, and the executive department is charged by Congress with the responsibility for the security of the prisoners, inmates, officials and others working within the particular institution. Thus, the federal courts have recognized that discipline and the general management of such institutions are executive functions with which the judicial branch ordinarily will not interfere. The established rule is that to be a proper basis for a prisoner or inmate to seek and obtain judicial relief against institutional treatment the matter must amount to unlawful administration of sentence or confinement. This is held to mean that the institutional treatment must be of such a nature as to clearly infringe upon constitutional right; or be of such character or consequence as to shock general conscience; or be intolerable in fundamental fairness.

Reference to the more recent opinions on this subject will illustrate the type of constitutional infringement or intolerable conduct mentioned above, and also will illuminate the well-settled rule that it is not the function of the courts generally to superintend the treatment and discipline of prisoners or inmates in such institutions.

The most recent pronouncement on the subject is by Judge Gibson in Douglas v. Sigler, Warden, 386 F.2d 684, 8th Circuit, November 28, 1967. In stating the well recognized applicable principles Judge Gibson declared: "The petitioner and other inmates of penal and correctional institutions should realize that the penal and correctional institutions are under the control and responsibility of the executive branch of the government and that courts will not interfere with the conduct, management and disciplinary control of this type of institution except in extreme cases. As this Court has stated in Lee v. Tahash, Warden, 352 F.2d 970, 971 (8th Cir. 1965) ' * * * it is settled doctrine that except in extreme cases the courts may not interfere with the conduct of a prison, with its regulations and their enforcement, or with its discipline.' * * * The matter of the internal management of prisons or correctional institutions is vested in and rests with the heads of those institutions operating under statutory authority, and their acts and administration of prison discipline and overall operation of the institution is not subject to court supervision or control, absent most unusual circumstances or absent a violation of a constitutional right."

In Sutton v. Settle (8th Cir. 1962), 302 F.2d 286, cert. den. 372 U.S. 930, 83 S. Ct. 876, 9 L.Ed.2d 734, it was expressed: "The Medical Center at Springfield is an institution in which arrested federal prisoners may prior to trial be placed under appropriate circumstances. * * * The responsibility for the supervision of such institutions and the inmates is placed upon the Attorney General. Courts have uniformly held that supervision of inmates of federal institutions rests with the proper administrative authorities and the courts have no power to supervise the management and disciplinary rules of such institutions."

In Harris v. Settle (8th Cir. 1963), 322 F.2d 908, the Court quoted with approval

from the opinion of the Fourth Circuit in Roberts v. Pegelow, 313 F.2d 548, 550, as follows: "Since management of the penal institutions has been placed by the Congress in the Executive Department, and the Executive Department is solely responsible for the security of the prisoners and of the officials and others working within the prison, they must be allowed to exercise a largely unfettered discretion in deciding what security measures are appropriate and, with respect to each prisoner, what relative freedom he safely may be allowed. * * * So long as the punishment imposed for an infraction of the rules is not so unreasonable as to be characterized as vindictive, cruel or inhuman, there is no right of judicial review of it. * * * Such questions as these have consistently been held to be nonjusticiable, for routine security measures and disciplinary action rest solely in the discretion of the prison officials and their superiors in the Executive Department."

The Eighth Circuit then proceeded to say: "There may, of course, be a rare and exceptional situation where a court will undertake to review the nature and conditions of a prisoner's otherwise lawful confinement." (Citations omitted.)

In United States ex rel. Morris v. Radio Station WENR, 209 F.2d 105, 107, the 7th Circuit expressed it thusly: "A prisoner may not approve of prison rules and regulations, but under all ordinary circumstances that is no basis for coming into a federal court, seeking relief, even though he may claim that the restrictions placed upon his activities are in violation of his constitutional rights. * * We think that it is well settled that it is not the function of the courts to superintend the treatment and discipline of prisoners in penitentiaries * * *."

In Lee v. Tahash (8th Cir. 1965), 352 F.2d 970, petitioner sought a declaratory judgment and an injunction against the prison warden because of prison mailing regulations involving the return to the prisoner of certain letters he had at-tempted to mail. Judge Johnsen, in writing the affirmance of the trial court's dismissal of the action for failure to state a claim, wrote: "Restrictions on the extent and character of prisoners' correspondence and examination or censorship in relation thereto have always been regarded as inherent incidents in the conduct of penal institutions and the control of confinements, activities, preoccupations and other relationships therein.

"As to the justiciability of this and other elements of sentence-execution generally, it is settled doctrine that except in extreme cases the courts may not interfere with the conduct of the prison, with its regulations and their enforcement, or with its discipline. (Citations omitted.)

"Attempts to have the courts deal with correspondence privilege in prisons are, as indicated, within this doctrine. Contrary to the apparent view of prisoners, and of appellant here, the privilege which an individual may enjoy on the outside of writing whatever letters he desires, on whatever subject he sees fit, and to whatever persons he chooses, is not one to which the law gives an abstract reach into penal institutions. (Citations omitted.)

"Thus, the fact that prison authorities, whether federal or state, have refused to allow mailing of some particular letter or letters or to some particular person or persons does not of itself afford basis for a prisoner to try to get into the federal courts. Nor will the fact that particular refusals seem to him to constitute improper interpretation of the prison regulations, or erroneous judgment on the letters themselves, or different treatment in relation to them than he feels has occurred to some other prisoner or prisoners, of itself give rise to any justiciability. Whether improper interpretation, erroneous judgment, or variant administration may be involved in the restriction of some particular correspondence is, without more, mere in-

stitutional incident, and not matter of judicial domain.

"In general, for there to be basis for a prisoner to seek judicial relief against penal-institution treatment, it must amount to unlawful administration of prison sentence.

\*　　\*　　\*　　\*　　\*　　\*

"This will be true where the refusal to allow mailing of some particular letter or letters has effect on some absolute right, which the law secures to a prisoner despite his penal status, of such substance as to produce a denial or infringement of that right. Thus, restrictions will not be allowed to operate to deny a prisoner access to the federal courts for the presentation of alleged legal wrongs. Ex parte Hull, 312 U.S. 546, 549, 61 S.Ct. 640, 642, 85 L.Ed. 1034; Haines v. Castle, 7th Circuit, 226 F.2d 591, 593. Also, restrictions will be unlawful administration if they have been imposed in discrimination against a prisoner's religious beliefs or his race.

"The categories which have been mentioned are given in example only."

Judge Johnsen, on behalf of the court, ruled that the prison regulation limiting the number of persons with which the prisoner could correspond to twelve, and the subjecting of the correspondence to censorship, did not give rise to an action for deprivation of rights, and that this was so even though the prisoner could send out only one letter per day, not counting letters to his attorney of record, to his pastor, or to four other officials to whom sealed letters could be sent.

While some of the above cases in their language appear to concern only convicted persons, the teachings contained in them generally are applicable to inmates of a federal institution, such as the Springfield Medical Center, committed thereto under 18 U.S.C. § 4246. This is so because considerations of security, of institutional administration and of rehabilitative and medical practices are present to a large extent even though the particular inmate is an unconvicted person, and because Congress has placed the administration of such institutions in the executive department. Applying the appropriate teachings of the above cases that may be applicable to unconvicted inmates [1] to the evidence in this case, it is immediately apparent that the Petitioner, Parks, is not entitled to any of the relief which he has requested and that his contentions lack merit.

## LIMITED CORRESPONDENCE LIST

█ Parks testified that he was limited to a total of only 12 names on his approved correspondence list. The evidence disclosed that at his request he could have additional names added to that list for special purposes where there was any need for them to be added, and that his attorneys of record and courts where he had pending litigation or sought to file pleadings were not considered as a part of his 12 permitted names. Accordingly, the testimony taken in whole shows the 12 names limitation is merely a guideline—a flexible matter—and additional names will be approved by proper institutional authorities where there is any need therefor. The evidence does not disclose anything that would authorize judicial intervention.

## LIMITATION ON POSSESSION OF BOOKS AND MAGAZINES

█ As to Parks' testimony concerning an unreasonable limitation on his rights to keep books, magazines and similar material, the evidence establishes that the institutional rule permits him to have a maximum of 25 paperback books and/or magazines in his possession at any one time. The reason for this rule was stated by the administrative authorities to be based on the fact that each inmate had only one locker, which of necessity had to contain in orderly man-

---

1. Obviously, unconvicted persons in custody under § 4246 commitments are not being confined as punishment for any wrong doing.

ner all of his numerous possessions including this type of material, and that in the interests of space, sanitation and orderliness, this was believed to be a reasonable regulation. The evidence further indicated that the institution has a library available to inmates, containing 105 different magazines and over 18,000 books. It is clear that an inmate has available to him, in reasonable number, the usual magazines and books that one might expect to find in an institutional library.

Petitioner has failed to demonstrate any infringement of any constitutional right. The matters complained of are well within the jurisdiction of the executive branch and do not permit judicial intervention.

▇ Parks also complains that he is not permitted to have any magazines of a political nature, nor to have *Playboy* magazine. However, the evidence does not support his statement. It is true that *Playboy* magazine, as of the present, has not been approved by the institution, but according to the Director's testimony, the question of its approval is being referred to the Bureau of Prisons for its action, because of the Director's belief that there should be a decision on that magazine that will be applicable to all similar institutions, and not just to his. In any event, the approval or disapproval of a magazine of this type for use in a correctional institution, housing inmates of highly varied personalities and mental conditions, is one that, under the circumstances existing here, does not belong to the Court.

### INVOLUNTARY SERVITUDE CHARGE

▇ Parks stated that with regard to his claim of involuntary servitude, on his arrival at the institution he was led to believe that he must perform work, and that, acting upon the advice of a fellow inmate, Mr. Mills, he requested work in

General Industries, after unsuccessfully applying for work and training in welding. Mr. Robert Grunska, Director of Inmate Management, testified that Parks was received from Western Kentucky on March 8, 1967, by way of a § 4244 commitment, and upon receipt was unassigned—that is, given no job—and that he remained unassigned until August 17, 1967, when he was assigned to General Industries. Parks admits that he executed, on August 3rd, 1967 a Form 788, requesting employment in General Industries, but explains that he believed that he had to perform work somewhere, and that his signature was thus not voluntary. However, Mr. Grunska's testimony, corroborated by that of numerous others, clearly indicates that the Medical Center not only acknowledges that it does not have the right to have unconvicted inmates perform work unless the inmate wishes to do so,[2] but also that the Medical Center advises each inmate within a few days of his arrival that if he is an unconvicted person he has the right not to work. The evidence indicates that in this case Mr. Parks was so advised. Unfortunately, through his talk with another inmate, and possibly with a guard, he received the erroneous impression that if he did not accept employment of some kind, he would be discriminated against, and possibly sent to a ward for the more mentally regressed. He is free to cease working any time he wishes without being punished for so doing. That he is working is the result of his own voluntary decision.

### LIMITATION ON COMMERCIAL ACTIVITIES

▇ Turning to Parks' complaint that he is unlawfully prohibited from carrying on certain commercial activities, it is obvious that the rule of the institution, as applied to him, cannot be deemed to be unreasonable and most certainly does not

---

**2.** See, Tyler v. Harris, 226 F.Supp. 852, W.D.Mo.1965; Johnston v. Ciccone, 260 F.Supp. 553, W.D.Mo.1966; Jobson v. Henne, 2 Cir., 355 F.2d 129.

permit judicial interference. Parks is permitted to engage in leathercraft work daily and to purchase $25.00 worth of supplies each month for that use. He is permitted to send any leather items that he makes to people on his approved list. He apparently wishes to develop a much larger leathercraft business for personal profit from sales to people outside the institution, to possibly develop a mail order catalogue business, and to engage in other unnamed commercial activities while an inmate. The Director of the institution apparently has determined that this is wholly impractical, unwise, and beyond the institution's ability to provide the tools, supplies, manpower and other needed safeguards, to permit such activities. We deem this to be a matter that is not committed to the Court for its review or supervision under the present circumstances.

## PUNISHMENT FOR RESORT TO COURTS CHARGE

■ Parks asserts that he has been punished for filing writs, legal papers, and for making court appearances. Essentially he relies on the fact that when he left the Springfield Medical Center to attend the October 29, 1967, court hearing, his room was assigned to someone else, and upon his return he was placed in a less favorable room, shared with others. The testimony indicates that it is the practice of the institution to permit its medical staff to make requests and assignments to the more favorable rooms, based upon their medical opinion as to the need of inmates for such space, and that when any inmate leaves the institution for any reason, including going to court, since it is unknown how long he will be away, or whether he will return, the medical personnel in their discretion are permitted to assign someone into that vacant room. Careful consideration of all the testimony persuades that this practice is neither intended to

be nor is used as punishment, nor as a deterrent to an inmate contemplating legal action or resort to the courts. It is the established law that an institution may not punish for or deter one from proper resort to the courts, but, in the instant case, the institutional policy, as applied to Mr. Parks cannot be deemed to be that type of action. The decision to use his room was in effect a medical determination, and one which would have been applied to anyone vacating a room, and not just to a person who was leaving for a court appearance. It would appear to be a better and safer practice for the institution to make some effort to determine how long an inmate may be gone in those instances where he is leaving for the purpose of making a court appearance.[3] If it appears that his absence is likely to be no more than a few days, it would seem reasonable to endeavor to readmit him to his same quarters upon his return in order to obviate inmates making this type of charge and the requiring of a hearing in order to determine whether or not in the particular instance the action was an intentional attempt to discourage inmates from proper access to the courts.

## LACK OF MEDICAL TREATMENT CHARGE

■ In his original appearance Parks complained he was not getting sufficient medical treatment. However, review of all of the testimony indicates that he is getting medical treatment and this court is unable to say that he is not getting the medical treatment that he requires that is or should be reasonably available in the institution for one with his medical problem. The general rule is that the propriety and extent of medical treatment to be given to inmates is a decision with which the courts should not interfere in the absence of exceptional circumstances clearly not present here. See, Eaton v. Ciccone,

3. Usually a telephone call to the office of the United States District Attorney handling the case on behalf of the Government will result in sufficient information to indicate at least generally whether the absence will be brief or not.

283 F.Supp. 75, W.D.Mo.1966; Faught v. Ciccone, 283 F.Supp. 76, W.D.Mo. 1966. The evidence does not reveal any situation justifying or authorizing judicial interference.

## POLICE INVESTIGATION OF MAIL LIST

■ Parks complains that at least upon one occasion the institution made a police investigation of a person on his approved mail list. The testimony indicates that in some few instances the institution has done this and that the purpose of such checks is to be sure that the particular person is one capable of a meaningful relationship with the inmates—that is, that he or she is not a gangster or possessed of such an unsavory background or character as to be likely to be a bad influence upon the inmate. Having in mind that to the institution, and not to the courts, is committed the question of appropriate protective and rehabilitative treatment for inmates, the complaint is not one which would authorize the judiciary to substitute its expertize or judgment for that of the institution.

## DENIAL OF USE OF TYPEWRITER

■ Petitioner also has complained of the denial of the use of a typewriter to prepare his legal documents and other papers. The evidence indicates that there are some typewriters in the institution which are occasionally not in use, but that the institution has not made these available to the inmates. There is indication that the institution is considering setting up a typing room, with available typewriters for limited purposes, such as the preparation of legal documents for the federal appellate courts, where same are required to be typed. There is no evidence that the present failure to make typewriters available has prevented reasonable access to any court. Obviously it would be a convenience to those who are typists to be able to type their letters and pa-

pers, rather than take the longer route of handwriting them. However, the institutional practice, as presently applied, has not resulted in the deprivation of any legal right to Mr. Parks. See Kostal v. Tinsley, Warden, 10 Cir., 337 F.2d 845.

## MAIL CENSORSHIP CONTENTION

■ Petitioner claims his mail was improperly censored. The evidence indicates that no censorship whatsoever applied to mail between an inmate and his attorney of record, or between the inmate and any court. Under the institution's rules there are other persons and institutions to whom sealed letters may be sent. Additionally, if the inmate needs to send a sealed letter for some special purpose beyond that usually recognized in the "sealed letter practice" of the institution, if the circumstances appear to warrant it, he can apply for and obtain permission to use the sealed letter procedure. The record does not indicate that Petitioner was ever refused the right to use the sealed letter procedure for any purpose that could possibly justify it. As to the requirement that other mail be examined, such requirement seems to be no more than that usually required by most penal-type institutions in the United States, and is obviously premised, among others, on security reasons. The circumstances presented are such that the Court deems the censorship practice to be one well within the province of the institutional authorities rather than that of the Court. See, Austin v. Harris, W.D.Mo.1964, 226 F.Supp. 304.

## SEARCH AND SEIZURE CONTENTION

■ Parks claims the institution guards go through his locker and other possessions and take some items. Regular inspection of possessions of the inmates is made as a security and housekeeping measure but there is no evidentiary support for the charge that

such inspection violated any constitutional right of Parks or resulted in taking from him any particular papers or letters. It did result in him being directed to dispose of items in excess of his allowance. As elsewhere discussed, it is within the institution's authority to administer this type of regulation concerning possessions. See, Carey v. Settle, 8 Cir. 1965, 351 F.2d 483.

### RIGHT TO HAVE LEGAL ASSISTANCE FROM FELLOW INMATES

◼ One of Petitioner's more serious contentions is that he has been deprived of a legal right to receive legal assistance from fellow inmates. Mr. James Rigsby, the current Director of the Medical Center, stated that the institutional policy was simply that if an inmate really wanted assistance from a fellow inmate on a legal problem, the institution did not object, but that the institution did look into the matter enough to be sure that the situation was not that of a more assertive personality who had some feeling against the institution or the courts imposing his will on an inmate and, in effect, causing that inmate to engage in litigation or to make charges that he really did not want to make. Certainly that policy, coupled with the practice of the federal courts in this area to promptly appoint competent legal counsel from the local bar associations for any inmate at the Springfield Medical Center who indicates a need for legal assistance, is sufficient to demonstrate there has not been any deprivation of legal right to any inmate to have legal assistance. See, Austin v. Harris, W.D.Mo.1964, 226 F.Supp. 304, 307; Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356. Parks is the beneficiary of this policy, being represented at all stages of this proceeding by able, court-appointed counsel.[4]

### ILLEGALLY TREATED AS A PRISONER CHARGE

◼ The last contention of Petitioner is that the Springfield Medical Center treats the unconvicted inmate in exactly the same manner as it treats the convicted inmate, and that this violates constitutional principles. The short answer is that, although the Springfield Medical Center does receive both types of inmates; namely, the unconvicted and the convicted, and does treat them alike in many respects it does treat them differently in certain fundamental respects. First, and of primary importance, is that the unconvicted are not required to perform any work. Secondly, according to the testimony of Mr. Rigsby, the Director of the Springfield Medical Center, and of several of his personnel, there is an intentional, deliberate policy of being more lenient, wherever practical, in the treatment of the unconvicted particularly as to privileges available in the institution. Mr. Rigsby has expressed his intention to give even more attention to this subject in a further endeavor to make further appropriate distinctions between the two groups. Such action would seem highly desirous and should not be postponed. Tyler v. Harris, W.D.Mo. 1964, 226 F.Supp. 852, 855. It is the Court's view that under the evidence presented Parks is not being treated as a convicted person, and that his constitutional rights are not being violated in the challenged respect.

The above disposes of all of the essential and vital charges made on behalf of Petitioner Parks including all twelve contentions set out on pages 807, 808 of this Memorandum Opinion. A few minor matters either lacking any evidentiary support or being trivial in nature have not been individually treated in this Memorandum It is the Court's view that none of them are meritorious.

The writ is denied.

4. See, Clements v. Ciccone, No. 15462, W.D.Mo., 1967.