RITA H. DALE, Appellant, v. STATE OF NEW YORK, Respondent.
(Claim No. 51888.)

Third Department, May 16, 1974.

*Bruce J. Ennis* (*Paul R. Friedman* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General* (*Jeremiah Jochnowitz* and *Ruth Kessler Toch* of counsel), for respondent.

*Per Curiam.* This is an appeal from a judgment, entered June 5, 1973, upon a decision of the Court of Claims dismissing the claim.

Claimant was confined in Harlem Valley State Hospital at Wingdale, New York, for a period of 16 years which ended on April 18, 1967. The legality of her commitment and detention are not in issue. On December 10, 1969, claimant filed a claim against the State of New York alleging three causes of action, each seeking damages. The first was for negligence in the performance of a bilateral glaucoma operation upon claimant's

eyes on March 28, 1966; the second alleged that the operation constituted an assault and battery upon claimant since neither she nor her committee [1] consented to it; and the third asserted that the labor performed by claimant during her incarceration constituted involuntary servitude in violation of her constitutional rights.

Following trial, the court found that claimant had failed to sustain her burden of proof and, accordingly, dismissed the claims. The propriety of the dismissal of the cause of action for negligence is not challenged. Claimant's appeal is limited to the two latter claims as to which she contends the court's decision was against the weight of the evidence and infected with errors of law.

It is settled law in New York that claimant can recover damages for an assault if the operation was performed without her consent (*Schloendorff* v. *Society of N. Y. Hosp.*, 211 N. Y. 125, 129-130), at least in the absence of an emergency (*McCandless* v. *State of New York*, 3 A D 2d 600, 605-606, affd. 4 N Y 2d 797). It is equally clear that an uninformed or invalid consent is tantamount to no consent at all (*Darrah* v. *Kite*, 32 A D 2d 208, 210-211).

We agree with the trial court that the State obtained a valid and informed consent for the surgery. The letter from the director of the hospital to claimant's committee informed him that his ward had " been under the care of our Opthalmologist [*sic*] because of glaucoma and he recommended an eye operation to preserve her remaining vision." The consent form which was signed by both the committee and claimant stated that the operation was for " Bilateral Glaucoma ". In our view this gave all the information which was necessary to enable the committee to make an informed judgment on the facts of this case.

The requirements enunciated by Presiding Justice HERLIHY in *Darrah* v. *Kite* (*supra*) have not been violated in a case such as the one at bar where the surgical procedure that was contemplated and performed to correct a specific disorder was not of a radical nature which could not have been anticipated. In *Darrah*, the child was admitted to the hospital and consent was obtained from his parents for " routine tests ". There was no expectation that radical surgery in the nature of a ventriculogram, necessitating that " burr " holes be made in the child's head, would be performed. Here, surgery on claimant's eyes

---

1. Claimant was adjudged incompetent on July 24, 1962 and a committee was appointed pursuant to a petition filed by Dr. Lawrence P. Roberts, Director of the hospital. She was adjudicated competent on December 13, 1968.

to correct bilateral glaucoma so as to preserve her vision was expected and performed, and since approval for such surgery was in fact obtained, no other information was required to be given.

Turning to the second aspect of this case, it has been held that a cause of action may lie for involuntary servitude (see *Krieger* v. *State of New York,* 54 Misc 2d 583; *Jobson* v. *Henne,* 355 F. 2d 129 [2d Cir., 1966]; *Henry* v. *Ciccone,* 315 F. Supp. 889 [W. D. Mo., 1970]; *Anderson* v. *Ellington,* 300 F. Supp. 789 [M. D. Tenn., 1969]). In order to establish such a cause of action, claimant has the burden of demonstrating by a preponderance of the credible evidence (1) that she did work, (2) that she did not do so voluntarily, (3) that the work was not of a "normal housekeeping type and kind" or, if it was, that it was "ruthless" in the amount of work demanded and in the conditions under which the work was to be performed, and (4) that the work was not reasonably related to a therapeutic purpose (*Jobson* v. *Henne, supra,* pp. 131-132).[2]

There can be no dispute that claimant did work. Her own testimony to that effect is corroborated by the hospital record and by several of the State's witnesses who supervised her work. Claimant began working the second night after her admission cleaning the porch and dayroom. She later helped care for elderly patients, taking them out of bed, cleaning, washing and dressing them, placing them in wheel chairs, taking them to the dayroom and getting them food trays, and spoon-feeding some of them. Claimant testified that she was transferred at her request to the employees' dining room when she could no longer stand this work. She worked there as a waitress and set the tables before meals, refilled salt, pepper and sugar containers after meals, and swept the floor. She worked behind the counter in the employees' dining room briefly. Subsequently, she was assigned to the sewing room. Following her transfer to building H, claimant polished floors and worked in the diet kitchen.

It is clear, the trial court's conclusion to the contrary notwithstanding, that the above tasks were not of the normal housekeep-

---

2. We recognize that there is a line of cases that apparently deems the existence of a therapeutic goal for involuntary work irrelevant for Thirteenth Amendment purposes (see, e.g., *Henry* v. *Ciccone, supra; Parks* v. *Ciccone,* 281 F. Supp. 805 [W. D. Mo., 1968]; *Johnston* v. *Ciccone,* 260 F. Supp. 553 [W. D. Mo., 1969] but we think the better view, expressed in *Jobson,* is that involuntary labor may be justified by a genuine therapeutic purpose. See section 15.09 of the Mental Hygiene Law, as added by chapter 251 of the Laws of 1972.

ing type and kind but were in fact institutional maintenance work (*Jobson* v. *Henne, supra*, p. 132, n. 3).

We, therefore, turn to the issue of whether claimant worked voluntarily. The fact that claimant was adjudicated incompetent in 1962 and that the trial court found that she was unable, as a matter of law, to consent to the eye operation, is not dispositive of the question of whether she was able to work voluntarily.[3] Obviously, it would be placing an unreasonable burden upon the State hospital to require it to obtain the committee's consent to every decision the patient inevitably must make in day-to-day life in an institution. On this record, the trial court properly could have found that claimant did not lack the minimal mental capacity necessary to decide whether or not to work. However, it remains to be seen whether she did in fact consent to work and, if so, whether her consent was freely and voluntarily given.

If the consequences of a refusal to work are loss of privileges, punishment or denial of discharge, any claim of voluntariness would have to be examined closely (see *Wyatt* v. *Stickney*, 344 F. Supp. 373, 381 [M. D. Ala., 1972]). The testimony on the issue of the voluntariness of the work performed by claimant is conflicting.

The institutional food administrator, Phyllis Scerebini, testified that patients worked when they wanted to; that she knew of no case where a patient was told that her "honor card"[4] would be taken away if she refused to work; that such a statement would have been against hospital policy; and that only the building doctor could take away the honor card from a patient. Anna Pruner, a head dining room attendant, testified that claimant worked there "by choice". Marilyn Ruth Conklin, another head dining room attendant, testified that claimant came "at will" and never complained of work and liked her work. Dr. O'Donnell, who was the director of the hospital until 1962, testified that it was hospital policy to encourage patients to work but he did not know of any one being forced to work. To his knowledge, the honor card was not used to force patients to work and to do so would have violated hospital policy. He stated that the card was issued and taken away by the doctor in charge of a patient and that it would be wrong

---

3. For the period prior to 1962, claimant presumably had the mental capacity to decide whether or not to work (see *Hoff* v. *State of New York*, 279 N. Y. 490, 494; Mental Hygiene Law, § 29.03, as added by chapter 251 of Laws of 1972).

4. The honor card permitted patients to move freely through the wards and the grounds of the hospital.

for a physician to withhold the card to coerce a patient to work. He did not know of any complaints from claimant about being forced to work.

Dr. Bauman, a psychiatrist at the hospital since October, 1963 who had charge of claimant, testified that claimant often failed to go to her job at the dining room because she resented that kind of work and did not agree with her assignment; that claimant never told her that she did not want to work; that she sometimes enjoyed working; that patients who worked got open ward cards; that, in general, patients who did not work did not get honor cards; that the cards and transfers to a more pleasant ward were used as an inducement to get patients to work; that this was hospital policy and, she assumed, the policy of the Department of Mental Hygiene.

Dr. Fox who testified as an expert witness for claimant[5] stated that under the circumstances claimant worked as a result of coercion. Dr. Alger agreed, stating that in order to work, claimant had to suppress her feelings of resentment and act contrary to her real feelings and that her work was not voluntary because of the large element of coercion in the system of rewards.

Claimant testified that she was told to work and was assigned work. The hospital record indicates that on several occasions claimant refused to work. There is no indication in the record that claimant lost any of her privileges as a result of her refusal to work, however. In its decision the court concluded that claimant worked voluntarily and stated: '' The trial record as well as the hospital record clearly indicates that claimant was free to work or not to work as she pleased. There is not proof in the record that she was compelled or coerced to work at any time during her hospitalization.''

As to the period prior to October, 1963 when Dr. Bauman arrived at Harlem Valley State Hospital, there is no clear proof that claimant was compelled to work and the trial court's finding that claimant worked voluntarily is not against the weight of the evidence. There can thus be no claim for involuntary servitude for the period from claimant's admission into the hospital until October, 1963. As to the subsequent period from October, 1963 until claimant's discharge on April 18, 1967, Dr. Bauman's testimony as to the general policy in existence conflicts with that

5. Each of the expert witnesses for claimant studied a 103-page extract of the hospital record, which contains all the material pertinent to the claims here, skimmed the balance of the record, read Dr. Bauman's deposition and personally examined claimant prior to trial.

of Dr. O'Donnell and the other lay witnesses. Furthermore, there is no evidence that that policy was applied to claimant. Dr. Bauman herself admitted that it was not always that a patient refusing to work would lose her honor card. It is significant that there is no clear proof in this record that claimant ever lost her ward card solely as a result of her refusal to work. Thus, the trial court's finding that the claimant was not compelled or coerced to work at any time during her hospitalization is not against the weight of the evidence. Since the claimant has failed to sustain her burden of proof that the work was involuntary, her claim for involuntary servitude must fail and it is unnecessary to consider whether the work assigned to her was reasonably related to a therapeutic program.

The judgment should be affirmed, without costs.

COOKE, J. (dissenting in part and concurring in part). We dissent from that part of the majority's opinion which affirms the dismissal of the claim for assault and battery and vote that said claim be remitted to the Court of Claims for an assessment of damages.

The majority recognizes that claimant can recover damages for an assault if the operation was performed without her consent, at least in the absence of an emergency, and that an uninformed or invalid consent is tantamount to no consent at all. In order for an informed consent to be obtained, the person whose consent is sought must at least be informed of the hazards of the operation and of the available alternatives (*Fiorentino* v. *Wenger*, 19 N Y 2d 407, 413; *Darrah* v. *Kite*, 32 A D 2d 208, 211). *Fiorentino* involved an operation and there is stronger reason, in such a situation, for the imparting of information as to hazards and alternatives, since the condition of the patient has been diagnosed and the general procedures to be followed are apparent. In the case of tests, investigation and exploration are still under way so that the hazards and alternatives are not as well known.

Aside from the question of the validity of any consent obtained from claimant, an adjudicated incompetent (cf. *McCandless* v. *State of New York*, 3 A D 2d 600, 606, affd. 4 N Y 2d 797; *Darrah* v. *Kite, supra*, p. 212), the record is barren of any evidence from which it could be concluded that her consent was informed. Claimant testified that no doctor ever discussed the operation with her; that she signed the consent form because the supervisor brought the paper and told her to sign it to get her eye fixed; that she did not read the form because she had to sign it anyway; and that she was not told that both eyes were

to be operated upon. The only proof in the record as to the information given to the claimant's committee in securing his consent for the operation was contained in a letter[1] from the director of the hospital to him which did not address itself to the hazards of the operation or to the available alternatives. The consent form, which they both signed, was no more enlightening. The only relevant information it provided was that the operation was for "Bilateral Glaucoma."

That the consent form contained inadequate information is obvious from the testimony of Dr. Porter, an ophthalmologist, who testified for claimant that, on the basis of the letter and consent form, he would conclude that only one eye was being operated upon; that this was not sufficient information upon which to give an informed consent; and that in order to facilitate an informed consent, claimant and her committee should have been told about the specific nature of her condition, the reasons surgery was required, the type of surgery to be done, the risks of the surgery and that the committee should have been told that claimant would prefer the operation to be done by a private ophthalmologist outside the hospital. Dr. Porter's testimony was undisputed.

In its decision, the trial court concluded that "[t]he burden of establishing that the consent was uninformed is on the claimant. There is no evidence to support that contention. Certainly the committee could have been called to testify as to the nature and extent of his consent." All the proof in the record is to the effect that there was no informed consent and the court's conclusion to the contrary is against the clear weight of the evidence (see *Corratti* v. *State of New York,* 20 A D 2d 166, 169; cf. *Bradshaw* v. *State of New York,* 24 A D 2d 930). There is no indication in the record that any further information, not available at trial, was provided to claimant's committee. It appears undisputed that the committee was dead at the time of trial and no inference can be drawn from the failure to call him as a witness. (See, generally, Richardson, Evidence [10th ed., Prince], § 92, pp. 65-68.) In fact, an inference could properly have been drawn against the State for its failure to produce Dr. Waugh, the hospital ophthalmologist who performed the operation, particularly in view of claimant's unsuccessful

---

1. The letter stated: "Your ward, the above-named patient, has been under the care of our Opthalmologist [*sic*] because of glaucoma and he recommended an eye operation to preserve her remaining vision.

"Kindly date, sign and have witnessed, the attached Permission for Operation blank and return it to the hospital at your earliest convenience so that this operative procedure may be performed without undue delay."

efforts to examine him before trial. The result of such an inference would have been to place greater weight on the testimony advanced in favor of the claimant (see *Noce* v. *Kaufman,* 2 N Y 2d 347, 353; *Bradshaw* v. *State of New York, supra; Laffin* v. *Ryan,* 4 A D 2d 21, 24-26).

There is no reason to believe that the operation upon claimant was of an emergency nature, the undisputed testimony in the record being that the surgery was elective.

In *Darrah,* it was stated (32 A D 2d 208, 211, *supra*): "As the trespass on the body arises from the unlawful touching itself there need be no showing of negligence or malice and the plaintiff is entitled to any damages which flow from the unauthorized procedure regardless of the fact that the operation was performed with the utmost of care. The damages related to the cause of action for uninformed consent arise not because the procedure was performed unsatisfactorily, but because it was performed at all."

Regarding the damages suffered by claimant as a result of the surgery, there was uncontradicted proof that to avoid psychosis she should have been warned that she would be blind for about two weeks after the operation; that she was surprised at being unable to see after the operation; that she remained blind for about 10 days; and that as a result of the operation claimant has developed a fixation about someone assaulting her about her eyes. Claimant is entitled to damages for such injuries as there may have been as a result of the assault and battery and, accordingly, this claim should be remitted to the Court of Claims for an assessment of such damages.

HERLIHY, P. J., GREENBLOTT and KANE, JJ., concur in *Per Curiam* opinion; COOKE and MAIN, JJ., dissent in part and concur in part in an opinion by COOKE, J.

Judgment affirmed, without costs.