633 F.2d 599
 Thomas S. LEONHARD, Individually, and Thomas S. Leonhard, as
Natural Parent and Legal Guardian of: Michael Leonhard, an
Infant, Stephan Leonhard, an Infant, and Karen Leonhard, an
Infant, Plaintiffs-Appellants,
v.
The UNITED STATES of America; United States Department of
Justice; Hon. Griffin Bell, and His Predecessors in Office,
to and Including Hon. John Mitchell, Individually and in
Their Official Capacity; Thomas A. Kennelly, Individually
and in His Official Capacity; Gerald Shur, Individually and
in His Official Capacity; Benjamin R. Civiletti,
Individually and in His Official Capacity; The United States
Marshal's Service; Wayne B. Colburn, Individually and in His
Official Capacity; Five Unknown Agents of the United States
Department of Justice, Individually and in Their Official
Capacity; John Cameron, Individually and in His Official
Capacity; The New York State Department of Correctional
Services; Benjamin Ward, and His Predecessors in Office from
1967, Individually and in Their Official Capacity; The New
York State Board of Parole; Eugene Hammock, and His
Predecessors in Office from 1967, Individually and in Their
Official Capacity; The City of Buffalo; Samuel Giambrone,
Individually and in His Official Capacity, Defendants-Appellees,
and
Pascal Calabrese, Individually and in His Official Capacity,
Defendant.
 No. 658, Docket 79-6218.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 18, 1980.
Decided Aug. 28, 1980.
 
 Alan R. Feuerstein, Buffalo, N.Y. (Martoche and Feuerstein, Buffalo, N.Y., on brief), for plaintiffs-appellants.
 Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C. (Richard J. Arcara, U.S. Atty., W.D. New York, Alice Daniel, Asst. Atty. Gen., Washington, D.C., on brief), for the United States and other federal defendants-appellees.
 Gerald Ryan, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of New York, Cobby J. Shereff and Deborah L. Wolikow, New York City, Law Apprentices, on brief), for the New York State Dept. of Correctional Services and other state defendants-appellees.
 Anthony C. Vaccaro, Asst. Corp. Counsel, Buffalo, N.Y. (Joseph P. McNamara, Corp. Counsel, Buffalo, N.Y., on brief), for defendants-appellees City of Buffalo and Samuel Giambrone.
 Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Thomas Leonhard ("Leonhard"), suing in his own behalf and as legal guardian of his three children Michael, Stephan, and Karen Leonhard, appeal from the summary dismissal of their action, commenced in 1978 in the United States District Court for the Western District of New York, seeking money damages for the violation of his and his children's constitutional rights and for torts committed against the children resulting from the separation and concealment of the children from Leonhard in 1967. Named as defendants were the United States and various federal agencies and officials (the "federal defendants"), certain New York State agencies and officials (the "state defendants"), the City of Buffalo and Samuel Giambrone, a former Buffalo police officer (the "city defendants"), and one Pascal Calabrese. The three groups of defendants moved to dismiss on various grounds including collateral estoppel, statute of limitations, governmental immunity, and failure to state a claim upon which relief can be granted.
 
 
 2
 After hearing argument, the district court, Harold P. Burke, Judge, entered orders dismissing the complaint against all of the defendants, except Calabrese who had not been served with process. Plaintiffs appeal from those orders. The federal defendants argue that the appeal should be dismissed for lack of jurisdiction because the claims against Calabrese were never dismissed and because no judgment was actually entered in favor of Giambrone.
 
 
 3
 For the reasons set forth below, we hold that we have jurisdiction and that all claims were properly dismissed.
 
 I. THE FACTUAL BACKGROUND
 
 4
 In 1966, Leonhard and his wife Rochelle were divorced. The decree, entered by the State Supreme Court for Erie County, New York, awarded custody of their three children to Rochelle; Leonhard was given visitation rights.[1] Early in 1967, Rochelle married defendant Calabrese and she and the children lived with him in Buffalo. Shortly thereafter, however, Calabrese began serving a five-year term of imprisonment in a New York state prison. In early 1967, members of the Buffalo Strike Force for Organized Crime, a part of the United States Department of Justice, learned from defendant Giambrone, a detective in the Buffalo Police Department, that Calabrese might have useful information on organized crime. It developed that Calabrese was willing to testify against certain members of organized crime, but only if the Strike Force agreed to protect him, Rochelle and the children, and to relocate them with new identities. The Strike Force officials agreed to this and later in 1967 arranged Calabrese's transfer to a federal prison and moved Rochelle and the children to a military reservation. Leonhard was not consulted.
 
 
 5
 In the fall of 1967 Calabrese testified as a government witness in a successful prosecution of organized crime members. As a result of this cooperation, the New York State Parole Board granted him parole in February 1968. Defendant Kennelly, a Justice Department attorney working with the Buffalo Strike Force, arranged for Calabrese, Rochelle, and the children to be moved to a new and secret residence. Under Kennelly's direction, the government provided new identities and supporting credentials for the entire family and secured employment for Calabrese. The family later relocated again on its own initiative; at that point only Kennelly knew their identities and location.
 
 
 6
 The effect of all of this was that Leonhard was left without any knowledge of his children's whereabouts. He first tried to locate his children in August 1967. In mid-1969 Leonhard's attorney contacted Kennelly to attempt to locate the children. Kennelly refused to reveal the whereabouts of Rochelle and the children, but agreed to forward correspondence between Rochelle and Leonhard. Rochelle refused to permit Leonhard to see the children even at a neutral location, for fear they would reveal their new identities. Leonhard finally commenced an action in New York Supreme Court to modify the divorce decree and award him custody. He attempted to serve process on Rochelle via Kennelly, but Kennelly, who was not Rochelle's attorney, refused to accept service or to forward the papers. When Rochelle learned of the suit, from sources undisclosed, she warned Kennelly that if he in any way revealed her whereabouts she and the children would disappear without informing even Kennelly of their new identities and location. In June 1971, by default, the New York court granted Leonhard custody of the three children.
 
 A. The Prior Action ("Leonhard I")
 
 7
 In July 1971, Leonhard commenced an action in the United States District Court for the Western District of New York against Kennelly, John Mitchell (then Attorney General), and other officials of the Department of Justice. Alleging that the defendants had secreted his three children and given them new identities, and that he now had custody, Leonhard sought relief in the nature of mandamus, pursuant to 28 U.S.C. § 1361 (1970), to compel the defendants to disclose the whereabouts and new identities of the children. No damages were sought, and Leonhard sued only on his own behalf; his children were not parties to the action.
 
 
 8
 The district court denied mandamus and the judgment was affirmed in Leonhard v. Mitchell ("Leonhard I"), 473 F.2d 709 (2d Cir.), cert. denied, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973). This Court held that Leonhard had no "clear constitutional right to custody or visitation rights," 473 F.2d at 713, and that Kennelly's refusal to disclose the whereabouts of the children was a rational exercise of his discretion, making mandamus inappropriate:
 
 
 9
 Kennelly arranged to secrete Rochelle and the children at the specific request of Pascal Calabrese. At that time-February, 1968-Rochelle had legal custody of the children and believed that their safety from threatened violence required that they no longer be visited by their natural father. Information received by Strike Force officials concerning a "murder contract" placed on the heads of the Calabreses confirmed their initial fears. Kennelly's present refusal to disclose the location of Calabrese family is grounded in his sense of obligation to them, both because of his agreement never to disclose their location and of his continued belief that the lives of the children and Rochelle and Pascal would be endangered if this information should become known. In view of the circumstances, we could hardly dismiss this latter fear as groundless or irrational.
 
 
 10
 Id. at 713-14 (footnote omitted). The Court concluded as follows:
 
 
 11
 In sum, the extraordinary factual posture of this case indicates that Kennelly, rather than having abused a discretionary power which he held, acted in good faith in attempting to balance two competing interests: Thomas Leonhard's natural wish to be reunited with his children, and Rochelle Calabrese's equally natural desire to protect the children from serious harm or even death.
 
 
 12
 Id. at 714 (footnote omitted).
 
 B. The Present Complaint
 
 13
 On July 4, 1975, according to plaintiffs' counsel, Rochelle "decided that she had done a grave injustice to her children and to Thomas Leonhard and decided to put the children in contact with their father."[2] On July 11, 1975, Leonhard was reunited with his children. On June 30, 1978, Leonhard filed the present action, asserting twelve separately stated claims, three on his own behalf and nine on behalf of one or all of the children; on these claims each named plaintiff seeks damages ranging from $10,000 to $500,000.[3]
 
 
 14
 The complaint alleges that by separating and concealing the children from Leonhard from 1967 to 1975 and refusing Leonhard's repeated requests to be informed of their whereabouts, Kennelly and other agents of the Organized Crime Strike Force deprived the plaintiffs of their constitutional rights; Kennelly and the agents are said to have had "actual or constructive knowledge" that their acts violated plaintiffs' constitutional rights.[4] The complaint alleges that defendant Giambrone participated in the removal and concealment, that he "knew or should have known" that his conduct was in violation of the plaintiffs' constitutional rights, and that he acted "intentionally and under and by the full authority" of the City of Buffalo. These claims are asserted under 42 U.S.C. § 1983 (1976) and the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution.
 
 
 15
 In addition to these constitutional claims, asserted on behalf of both Leonhard and the children, the complaint asserts several non-constitutional claims on behalf of the children alone. It alleges that Calabrese committed torts against the children, and alleges that the United States, by arranging Calabrese's release and furnishing support and new identities for him, Rochelle and the children, undertook a duty, which it breached, to protect the children from mental and physical harm.[5]
 
 
 16
 In addition to the above defendants, several New York state agencies and officials were made defendants: the New York State Department of Correctional Services and Benjamin Ward, a former Commissioner of that Department, together with all of his predecessors in office; and the New York State Board of Parole and Eugene Hammock as an agent of that Board, together with all of his predecessors in office. None of the complaint's twelve separately stated claims is asserted against the state defendants. These defendants are simply listed in the section of the complaint denominated "Parties," and are alleged to have acted in concert with the federal defendants in releasing Calabrese from a correctional facility in the State of New York in contravention of state law.
 
 
 17
 C. The Decisions Below and the Appeals to This Court
 
 
 18
 All defendants, except Calabrese (who was never served and made no appearance) and Giambrone, moved to dismiss the complaint on the grounds, inter alia, that it failed to state a claim and that all claims asserted were barred by the applicable statutes of limitations. In addition, the federal defendants asserted that the decision in Leonhard I barred the plaintiffs from litigating the issues raised in the present complaint under principles of res judicata and collateral estoppel; the state defendants asserted that the state agencies and officials were immune from suit under the Eleventh Amendment; and the City of Buffalo asserted that it was immune from suit under the doctrines of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In opposition to the motions to dismiss, following a modicum of discovery of the state defendants, plaintiffs filed a detailed memorandum, several exhibits and two affidavits. The exhibits included copies of administrative claim forms that had been filed by Leonhard and each of the children with the government on June 27, 1977, claiming physical, mental and emotional injury as a result of the removal and concealment of the children. One of the affidavits submitted by plaintiffs was a copy of the affidavit that Kennelly had submitted in Leonhard I ;[6] the other was an affidavit apparently executed by Rochelle for the purposes of the present action.[7]
 
 
 19
 Eventually, the claims against all defendants except Calabrese were dismissed. The procession of dismissals and appeals, however, was somewhat unorthodox. On September 21, 1979, Judge Burke ordered the complaint against the federal defendants dismissed on grounds of res judicata, collateral estoppel, statute of limitations, and failure to file timely administrative claims, and ordered the complaint against the City of Buffalo dismissed on the authority of Monroe v. Pape, supra. Despite the absence of a certification pursuant to Fed.R.Civ.P. 54(b), judgment for the federal defendants and the City of Buffalo was entered on September 24.[8] Neither the September 21 order nor the September 24 judgment dealt with the state defendants, Giambrone or Calabrese. On October 17, plaintiffs filed notice of appeal from the September 21 order, and the appeal was docketed in this Court on October 22. On October 25, notwithstanding plaintiffs' October 17 attempt to appeal to this Court, Judge Burke entered a second order, this time dismissing the state defendants on grounds of failure to state a claim under § 1983, immunity under the Eleventh Amendment, and expiration of the statute of limitations. On October 30, plaintiffs filed an amended notice of appeal, seeking review of both of Judge Burke's orders (dated September 21 and October 25). Judgment in favor of the state defendants was entered in the district court on October 30, after plaintiffs' notice of appeal had been filed. Plaintiffs' amended appeal was added to this Court's docket on November 5, at which time there still had been no adjudication of the claims against Giambrone and Calabrese. On November 19, however, Judge Burke sent a letter to the Clerk of the district court, authorizing him to correct a "typographical error" in the September 21 order, by adding Giambrone to the defendants dismissed. The Clerk received this letter on November 20, but since the district court record had already been sent to this Court, no change was actually made on the order itself. No judgment was entered in favor of Giambrone nor did plaintiffs file any additional notice of appeal. Judge Burke's letter of November 19 was eventually entered on the district court docket on February 4, 1980, subsequent to argument of the appeal in this Court; on February 5, the letter was transmitted to this Court as a supplement to the original record. Finally, on February 15, 1980, Judge Burke ordered that his previous decisions of dismissal "be certified and considered as a final appealable Order."
 
 II. APPELLATE JURISDICTION
 
 20
 The federal defendants point out that neither of the judgments appealed from adjudicated the claims against Calabrese and Giambrone. They argue that since the judgments adjudicated the rights of fewer than all the parties and contained no certification pursuant to Fed.R.Civ.P. 54(b), they are not final, and therefore not appealable under 28 U.S.C. § 1291 (1976). For the reasons below we disagree.
 
 A. Calabrese
 
 21
 We begin with the effect of the non-dismissal as to Calabrese, who was not served with process and did not appear. It is clear, under Rule 54(b), that when there are two or more defendants who have been served and the district court dismisses the action as to fewer than all of them, a final judgment may not be entered reflecting that dismissal unless the court so instructs and makes an "express determination" that there is no just reason to delay entry of the judgment. E. g., New York v. Nuclear Regulatory Comm'n, 550 F.2d 745, 761 (2d Cir. 1977); Independent Investor Protective League v. Touche Ross & Co., 542 F.2d 156, 157 (2d Cir. 1976); Robert Stigwood Group Ltd. v. Hurwitz, 462 F.2d 910, 913 (2d Cir. 1972). In such a situation the early dismissal remains subject to revision until the liabilities of all defendants have been adjudicated; thus an immediate appeal should not be available. When, however, the action is dismissed as to all defendants who have been served and only unserved defendants "remain," the circumstances are materially different. Now there is no reason for Rule 54(b) to preclude the immediate and automatic entry of a final judgment since there is no basis for believing there will be any further adjudications in the action, or, therefore, for holding the dismissals subject to revision.[9] Thus, at least two circuits have held that a defendant who has not been served is not a party for purposes of Rule 54(b). See United States v. Studivant, 529 F.2d 673, 674 n. 2 (3d Cir. 1976); Siegmund v. General Commodities Corp., 175 F.2d 952, 953 (9th Cir. 1949).
 
 
 22
 This reading of Rule 54(b) is consistent with the practice which prevailed prior to the adoption of the Rule in its present form (prior to 1963 the Rule dealt with multiple claims but was silent as to multiple parties) and indeed prior to the adoption of the original Federal Rules in 1938. In Ferguson v. Bartels Brewing Co., 284 F.2d 855, 857 (2d Cir. 1960), this Court dismissed an appeal because the order appealed from had not dealt with one of the defendants who had been served, but recognized the distinction in question here:
 
 
 23
 (O)ne of the individuals named as codefendant . . . has apparently not been served. Thus he is not a party to the case, and his designation as a codefendant would not bar entry of a final judgment against the other defendants who have been actually made parties.[10]
 
 
 24
 Compare Hohorst v. Hamburg-American Packet Co., 148 U.S. 262, 13 S.Ct. 590, 37 L.Ed. 443 (1893) (the absence of a dismissal as to some served defendants prevented entry of a final, appealable order of dismissal as to one defendant), with Hooven, Owens & Rentschler Co. v. John Featherstone's Sons, 111 F. 81, 84-85 (8th Cir. 1901), and Bradshaw v. Miners' Bank, 81 F. 902, 904 (7th Cir. 1897) ("The right of appeal from the decree in favor of the Miners' Bank is not affected by the fact that there has been no decree against the Illinois & Missouri Lead & Zinc Company. That company, though named in the bill as a respondent, was not served with process, and therefore is not a party to the record . . . .").
 
 
 25
 Hence we conclude that the absence of a dismissal as to Calabrese is no impediment to the present appeal.
 
 B. Giambrone
 
 26
 The treatment of Giambrone is somewhat more complex. The federal defendants argue that the appeals taken before Giambrone was dismissed gave this Court no jurisdiction, but that the docketing of those attempted appeals made ineffective the district court's November 19 attempt to amend its September 21 order to reflect the dismissal of Giambrone. In addition they contend that even if the September 21 order were deemed amended by Judge Burke's November 19 letter, no appeal would lie because the dismissal of Giambrone was never embodied in a judgment.[11] We are not persuaded.
 
 
 27
 As originally entered, the orders of September 21 and October 25 were not appealable because neither of them dealt with the claims against Giambrone. We agree that in those circumstances the attempted appeals did not give us jurisdiction. Judge Burke's letter of November 19, however, authorized the Clerk of the district court to correct a "typographical error" in the order of September 21, to include the dismissal of the complaint as against Giambrone. The question is whether the district court had retained jurisdiction to make the correction.
 
 
 28
 Normally the filing of a timely and sufficient notice of appeal immediately transfers jurisdiction, as to any matters involved in the appeal, from the district court to the court of appeals. Once a proper appeal is taken, the district court may generally take action only in aid of the appeal or to correct clerical errors as allowed by the Federal Rules of Civil (or Criminal) Procedure.[12] See 9 Moore's Federal Practice P 203.11 (2d ed. 1980). Whether or not the filing of a notice of appeal from a non-appealable order also immediately divests the district court of jurisdiction to proceed as to the matters involved in the purported appeal is not answered by the Rules themselves, and the courts which have considered the question have divided.[13] Compare United States v. Hitchmon, 602 F.2d 689 (5th Cir. 1979) (en banc); Hodgson v. Mahoney, 460 F.2d 326, 328 (1st Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 519, 34 L.Ed.2d 488 (1972); Ruby v. Secretary of the United States Navy, 365 F.2d 385, 388-89 (9th Cir. 1966) (en banc), cert. denied, 386 U.S. 1011, 87 S.Ct. 1358, 18 L.Ed.2d 442 (1967); Euziere v. United States, 266 F.2d 88, 91 (10th Cir. 1959), vacated on other grounds, 364 U.S. 282, 80 S.Ct. 1615, 4 L.Ed.2d 1720 (1960), holding that the district courts retained jurisdiction, with Williams v. Bernhardt Bros. Tugboat Serv., Inc., 357 F.2d 883 (7th Cir. 1966); District 65, Distributive, Processing & Office Workers Union v. McKague, 216 F.2d 153 (3d Cir. 1954), holding to the contrary. District courts in this circuit have taken the position that such an attempted appeal does not deprive them of the power to proceed, Browning Debenture Holders' Committee v. DASA Corp., 454 F.Supp. 88 (S.D.N.Y.1978); Weisman v. Darneille, 79 F.R.D. 389 (S.D.N.Y.1978); Lowenschuss v. Kane, 392 F.Supp. 59 (S.D.N.Y.1974),[14] and we find this to be the preferable view. While greater certainty as to district court power results from the more rigid rule that any filing of a notice of appeal divests the district court of jurisdiction as to the matters covered by the notice, we see no efficiency to be gained by allowing a party arbitrarily to halt the district court proceedings by filing a plainly unauthorized notice which confers on this Court the power to do nothing but dismiss the appeal. Hence we conclude that the district court retained power to correct the judgment of September 24 to reflect its dismissal of the action against Giambrone.
 
 
 29
 A related question is whether we are deprived of jurisdiction to hear the appeal from the now final order below on the ground that the notice of appeal was premature. Some courts have taken a strict view that the court of appeals must have jurisdiction of the appeal, if at all, at the time the notice is filed. See, e. g., Williams v. Bernhardt Bros. Tugboat Serv., Inc., supra. Others have deemed premature appeals to be validated by subsequent events. See, e. g., Lemke v. United States, 346 U.S. 325, 74 S.Ct. 1, 98 L.Ed. 3 (1953); Richerson v. Jones, 551 F.2d 918, 922 (3d Cir. 1977); Tilden Financial Corp. v. Palo Tire Serv. Inc., 596 F.2d 604, 606-07 (3d Cir. 1979); Plummer v. United States, 580 F.2d 72 (3d Cir. 1978); Morris v. Uhl & Lopez Eng'rs, Inc., 442 F.2d 1247, 1250-51 (10th Cir. 1971); Markham v. Holt, 369 F.2d 940 (5th Cir. 1966); Ruby v. Secretary of the United States Navy, 365 F.2d 385 (9th Cir. 1966) (en banc), cert. denied, 386 U.S. 1011, 87 S.Ct. 1358, 18 L.Ed.2d 442 (1967). See also 9 Moore's Federal Practice P 204.14 (2d ed. 1980); 15 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3915 at 599-600 (1976).[15] In the absence of prejudice to the nonappealing party, this Court too has declined to dismiss premature notices of appeal where subsequent actions of the district court have imbued the order appealed from with finality. See, e. g., Sanchez v. Maher, 560 F.2d 1105, 1107 n. 2 (2d Cir. 1977) (appeal allowed where notice of appeal filed after the decision but before entry of judgment; judgment not entered until after argument of the appeal); Gumer v. Shearson, Hammill & Co., 516 F.2d 283 (2d Cir. 1974) (appeal allowed where, after notice of appeal had been filed, district court entered Rule 54(b) certification nunc pro tunc ); Kaufman & Ruderman, Inc. v. Cohn & Rosenberger, 177 F.2d 849 (2d Cir. 1949) (appeal decided on merits, with permission granted to seek Rule 54(b) certification, nunc pro tunc ). The defendants in the present case have not indicated any respect in which they would be better off if the appeal had been taken after the November 19 correction, rather than before. We therefore treat the premature notice of appeal as having been timely filed after the dismissals by the district court became final orders.
 
 
 30
 Finally, we do not find the absence of an actual judgment embodying the dismissal of Giambrone fatal to our jurisdiction. Although Fed.R.Civ.P. 58 requires that a judgment be set forth on a separate document,[16] this requirement is intended merely to pinpoint, principally for the benefit of the appellant, the commencement of time for filing a notice of appeal. Thus, in Bankers Trust Co. v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), the Supreme Court held that appellate jurisdiction could properly be assumed even though the separate document requirement had not been met:
 
 
 31
 Certainty as to timeliness, however, is not advanced by holding that appellate jurisdiction does not exist absent a separate judgment. If, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal. Upon dismissal, the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose.
 
 
 32
 Id. at 385, 98 S.Ct. at 1120 (footnote omitted). The Court in Bankers Trust noted that the district court had clearly intended that its opinion and order be the final decision in the case, "(a) judgment of dismissal" was recorded in the district clerk's docket, and the appellee did not object to the taking of the appeal in the absence of a separate judgment. In those circumstances, the Court held, the parties "should be deemed to have waived" the separate document requirement and a court of appeals can properly take jurisdiction. Id. at 387-88, 98 S.Ct. at 1121. See Elfenbein v. Gulf & Western Industries, Inc., 590 F.2d 445, 449 (2d Cir. 1978); Turner v. Air Transport Lodge 1894, 585 F.2d 1180 (2d Cir. 1978).
 
 
 33
 While the facts of the present case are somewhat different, the rationale of Bankers Trust requires that we not spin our wheels here by dismissing for lack of a judgment. Judge Burke clearly intended the September 21 order, as corrected by the November 19 letter, and as supplemented by the October 25 order, to be his final decision in the case, and separate judgments were actually entered prior to his correction of the "typographical" omission of Giambrone from the September order. All that remained was the ministerial task of making the mandated correction of the September judgment already entered, instruction for which has itself now been entered in the docket.
 
 
 34
 We do not believe the interests of any party will be harmed by our refusal to dismiss at this stage. Giambrone has not objected to the taking of this appeal in the absence of a judgment in his favor. It is true that the federal defendants have objected, but they have not shown any respect in which they have been prejudiced; since final dismissals have been ordered as to all served defendants, it is difficult to see how the temporary technical defect as to Giambrone could prejudice any defendant. We therefore will instruct the Clerk of the district court to make the appropriate correction upon receipt of our mandate, and for present purposes we treat such correction as having been made. We now turn to the merits of the appeal.
 
 III. LEONHARD'S CLAIMS
 
 35
 We deal first with the claims on behalf of Leonhard, which assert that each group of defendants violated Leonhard's constitutional rights. Among the defenses interposed was the bar of the statute of limitations. For the reasons below we agree that Leonhard's claims are time-barred.[17]
 
 A. The Federal Defendants
 
 36
 The gist of Leonhard's claims against the federal defendants is that, commencing on or about August 15, 1967, various federal officials violated his constitutional rights by removing and concealing his children from him until July 1975. Leonhard's claims are apparently based directly on the United States Constitution, under the principles of Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Since this action was not commenced until June 30, 1978, more than ten years after removal of the children, the defendants contend that it is time-barred. The merit of their contention depends on when Leonhard's causes of action accrued and what period of limitations is applied.
 
 
 37
 Leonhard contends that the statute did not begin to run until July 1975. He argues that his claim accrued anew each time he wished to visit his children and was unable to do so: "Each time he was deprived of these rights, a new cause of action accrued and continued to accrue until July 11, 1975, when Appellant and his children were reunited." (Brief at 57). There are a variety of possible dates on which Leonhard's claim may be deemed to have ripened for statute of limitations purposes, but none of them as late as that he urges.
 
 
 38
 Under general principles of law, a cause of action accrues when conduct that invades the rights of another has caused injury. When the injury occurs, the injured party has the right to bring suit for all of the damages, past, present and future, caused by the defendant's acts. See Restatement (Second) of Torts §§ 899, 910 (1977). The earliest allegedly wrongful act which resulted in Leonhard's loss of his children occurred sometime in 1967, when Leonhard's children were removed from New York and first concealed from him.[18]
 
 
 39
 At common law this general principle is subject to the modification that a claim to redress a continuing wrong will be deemed to have accrued on the date of the last wrongful act. Thus, in New York, "(d)espite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act." N.Y.Civ.Prac. Law (hereinafter "CPLR") § 203 note (McKinney 1972) (McLaughlin, Practice Commentaries C203:1). See also Restatement (Second) of Torts § 899, comment c ("For false imprisonment, the statute begins to run only when the imprisonment ends, since the period of imprisonment is treated as a unit.") This rule is well illustrated by the decision in Montgomery v. Crum, 199 Ind. 660, 161 N.E. 251, 257-59 (1928). There a mother, who had been awarded custody of her daughter following a divorce, sought damages for the abduction of the daughter by her estranged husband and his parents, which had resulted in a nine-year separation of mother from daughter. In response to an assertion that the two-year statute of limitations barred the mother's claim, the court observed that if the abduction consisted of an unbroken chain of wrongful acts at least some of which occurred during the two years immediately preceding suit, the statute would not bar the action, stating that "the statute of limitations will not begin to run until there is a cessation of the overt acts constituting the wrong." 161 N.E. at 259. But if all of the overt acts preceded that two-year period, the statute would have run. Id. Accord: Restatement (Second) of Torts § 899, comment c: "When there has been a loss of services over a considerable period of time by a continuous series of acts, as when a child is withheld from the custody of his parents, the injured party recovers only for that to which he was entitled within the statutory period before suit." (Emphasis added.) Thus if we are to apply the common law modification to determine when Leonhard's causes of action arose, we will have to determine the date of the defendants' last overt act. A preliminary question is whether common law rules should be applied.
 
 
 40
 Although we must look to state law to determine what period of limitations applies, see text following note 21 infra, the issue as to when Leonhard's cause of action accrued remains a question of federal law, Kaiser v. Cahn, 510 F.2d 282, 285 (2d Cir. 1974), and there are persuasive reasons in the present case for eschewing application of the common law accrual principles appropriate for torts such as abduction. First, the defendants at all times dealt with the children's mother, who had custody of them and who joined in and consented to their relocation and concealment. A claim for abduction or false imprisonment would thus be untenable. See part V. C. infra. Moreover, there were reasons for the defendants' actions which strongly implicate federal interests. Their actions were concededly part of "their efforts to deal with a very serious problem, organized crime, and to make an agreement, a deal, with a government informant." (Statement of plaintiffs' counsel at hearing in district court.) The procurement of testimony against alleged members of organized crime will normally require appropriate protection of both the informant and his family. Relocation and concealment will commonly be part of this protection. To prevent intimidation, we would think the protection would begin prior to any disclosure to the putative criminals that the informant will testify. Thereafter the protection would continue in order to prevent reprisals: after the government has obtained the testimony of the informant, it would hardly seem prudent or conscionable for the government officials to turn and disclose the whereabouts of the informant's family. It appears, therefore, that once the family of an informant is concealed, the federal officials are virtually committed to continue that concealment for some period of time. Thus, it is the initial concealment which would give rise to a right of action, and subsequent acts in furtherance and continuation of the concealment should not give rise to new or renewed causes of action. If we apply this principle, Leonhard's cause of action accrued in 1967.
 
 
 41
 Even if common law accrual rules applied, however, Leonhard would not be able to justify his preferred 1975 date, since he does not allege that any of the defendants' acts occurred as late as 1975.[19] While the complaint alleges conclusorily that the federal defendants concealed the children until 1975 and refused his "repeated requests to be informed of (their) whereabouts," no overt acts are alleged. And the affidavit of Rochelle, submitted to the district court by plaintiffs, shows only that the government concealed and supported Rochelle and the children until July 1970.[20] Thus, even applying common law rules, on the basis of the evidence presented by plaintiffs we conclude that Leonhard's claims accrued not later than July 1970.[21]
 
 
 42
 The remaining question is within what period Leonhard was required to bring suit. Since Congress has not provided a statute of limitations for Bivens actions, we must use the most nearly analogous state statute of limitations. See Board of Regents v. Tomanio, 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).
 
 
 43
 In Regan v. Sullivan, 557 F.2d 300 (2d Cir. 1977), this Court held that the most appropriate statute for a Bivens action accruing in New York is either the three-year limitation provided by CPLR § 214(2) for an action to recover upon a liability imposed by statute, or the six-year limitation provided by CPLR § 213(1) for actions for which no limitation is specifically prescribed. In Regan we had no need to determine which of the two periods was the more appropriate because the action was barred under either statute. The same is true here. Since Leonhard's causes of action accrued no later than 1970, i. e., more than six years before the June 1978 commencement of this suit, the suit is barred.
 
 B. The State Defendants
 
 44
 Leonhard's complaint challenges only a single act by the state defendants: that they released Pascal Calabrese from custody prior to the date authorized by law. While the complaint is far from clear in this respect, it may be construed to allege that the release of Calabrese in 1968 violated Leonhard's constitutional rights and to seek relief under § 1983.[22]
 
 
 45
 As to § 1983 actions, like Bivens -type actions, Congress has not specified a statute of limitations, and again we must look to state law. With respect to § 1983 actions brought in federal district courts in New York, this Court has repeatedly held that the appropriate period is the three-year limitation of CPLR § 214(2). Taylor v. Mayone, 626 F.2d 247 (2d Cir. 1980); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 449 (2d Cir. 1980);[23] Leigh v. McGuire, 613 F.2d 380 (2d Cir. 1979), vacated and remanded for further consideration, --- U.S. ----, 100 S.Ct. 2935, 64 L.Ed.2d 820 (1980); Meyer v. Frank, 550 F.2d 726 (2d Cir.), cert. denied, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977); Kaiser v. Cahn, 510 F.2d 282 (2d Cir. 1974); Ortiz v. LaVallee, 442 F.2d 912 (2d Cir. 1971); Swan v. Board of Higher Education, 319 F.2d 56 (2d Cir. 1963); Bomar v. Keyes, 162 F.2d 136, 140 (2d Cir.) (L. Hand, J.) (predecessor statute of § 214(2)), cert. denied, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947).
 
 
 46
 There is no reason to apply a different limitations period here. Since Calabrese was paroled in 1968, and Leonhard's complaint was filed in 1978, Leonhard's action against the state defendants is time-barred.
 
 C. The City Defendants
 
 47
 Leonhard's claim against the city defendants also is asserted under § 1983. The claim is that Giambrone, acting under color of law as an employee of the Buffalo police department and acting with the authority of the City, participated in the removal and concealment of Leonhard's children from him.[24] Although the complaint contains conclusory assertions that Giambrone and the City refused to reveal the children's whereabouts to Leonhard and impeded Leonhard's efforts to find them, it does not allege any overt acts on the part of Giambrone or the City after 1967. We conclude, therefore, that Leonhard's claims against Giambrone and the City accrued in 1967 when the children were removed, or in any event no later than 1970 when the last overt acts to conceal the children occurred. See part A above. Since a three-year period of limitations applies to these claims, see part B above, Leonhard's claims against the city defendants were properly dismissed.
 
 IV. THE CHILDREN'S CONSTITUTIONAL CLAIMS
 
 48
 As outlined in part I, the children, like Leonhard, assert that the acts of the defendants violated their constitutional rights. The district court drew no distinction between the claims of Leonhard and those of the children. The children's constitutional claims against each group of defendants were held barred by the statute of limitations; in addition their claims against the federal defendants were held barred by principles of collateral estoppel, their claims against the state defendants were held barred by the Eleventh Amendment and dismissed for failure to state a claim, and their claims against the city defendants were held barred by the principle of Monroe v. Pape, supra. We disagree with certain of these rationales, although not with the results.
 
 
 49
 While the claims of Leonhard himself are barred by the applicable statutes of limitations, the constitutional claims of the children are not. As noted above, for both Bivens -type actions and § 1983 actions we must borrow the most appropriate state statutes of limitations. In addition, however, to the extent not inconsistent with the policies underlying the federal claims, we must borrow any restrictions placed by the state on the running of the statutes. See Board of Regents v. Tomanio, supra; Johnson v. Railway Express, supra. New York CPLR § 208 provides that the running of the statute of limitations is tolled if the person possessing the cause of action is under a disability because of infancy. A three-year or longer statute of limitations is tolled until three years after the disability ends. Since the record indicates that the oldest of the Leonhard children did not reach the age of 18 until six months before this suit was commenced,[25] we conclude that the assertion of their claims is timely.
 
 
 50
 Nor should the children's claims have been dismissed on grounds of collateral estoppel. The district court felt that the denial of mandamus in Leonard I presupposed a finding that the defendants owed no duty to the children. While there may be ground for differing views as to whether the claims of Leonhard himself are barred by the decision in Leonhard I,[26] there is no question that the claims of the children are not so barred. The children were not parties to Leonhard I, and the duties in issue there were those allegedly owed to Leonhard and not to the children. "Some litigants-those who never appeared in a prior action-may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position." Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); see Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979).
 
 
 51
 This leaves for analysis the contentions that the children have failed to state a constitutional claim upon which relief can be granted. We consider this contention with respect to each group of defendants in turn.
 
 A. The Federal Defendants
 
 52
 The complaint alleges that the acts of Kennelly and other agents of the Department of Justice in removing the children in 1967 and concealing them from Leonhard deprived the children of their constitutional rights to visitation, companionship and rearing by their natural father, without due process of law.[27] Our analysis of the interests and status of the children and of the governmental functions involved persuades us that the children have failed to state a constitutional claim.
 
 
 53
 It has long been recognized that the relationship between parent and child is constitutionally protected. E. g., Quilloin v. Wolcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); Wisconsin v. Yoder, 406 U.S. 205, 231-33, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15 (1972); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Meyer v. Nebraska, 262 U.S. 390, 399-401, 43 S.Ct. 625, 626-627, 67 L.Ed. 1042 (1923); cf. Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The Due Process Clause limits the power of the state to take action which ruptures or impinges upon the parent-child relationship. As the Supreme Court stated in Quilloin v. Wolcott, supra :
 
 
 54
 We have little doubt that the Due Process Clause would be offended "(i)f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."
 
 
 55
 434 U.S. at 255, 98 S.Ct. at 555 (quoting Smith v. Organization of Foster Families, 431 U.S. 816, 862-63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment)). Cf. Moore v. City of East Cleveland, 431 U.S. 494, 503-06, 97 S.Ct. 1932, 1937-39, 52 L.Ed.2d 531 (1977) (plurality opinion) (state may not arbitrarily prevent members of an extended family from living together). Thus, the state may not constitutionally withhold children, properly taken into temporary custody by the state in an emergency, from their mother without her consent and without judicial authorization. Duchesne v. Sugarman, 566 F.2d 817, 828 (2d Cir. 1977); see Morrison v. Jones, 607 F.2d 1269, 1276 (9th Cir. 1979), cert. denied, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). Nor may it deprive a divorced father of notice and an opportunity to be heard before his child is adopted by his marital successor. Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed. 62 (1964). Even in cases of child neglect, the Due Process Clause places limits on the state's power to terminate the parent-child relationship. See generally Note, Constitutional Limitations on the Scope of State Child Neglect Statutes, 79 Colum.L.Rev. 719 (1979).
 
 
 56
 In analyzing the applicability of such precepts to the children's claims in the present case it is important at the outset to identify certain contentions that are not pertinent here. First, the visitation rights of Leonhard are not involved. Even assuming that Leonhard had a constitutionally protected interest in visiting his children, a question we have not reached because Leonhard's claims are time-barred, the children do not have standing to complain of abridgement of Leonhard's rights. Second, the theory that the removal and concealment of the children "consigned" them to the company of a convicted criminal has no factual basis. The children were committed to Calabrese's company when Rochelle married him, and they lived with him before he commenced to serve his prison term. Rochelle had custody of them when she separated from Leonhard, and her custody was not altered when she married Calabrese. While the early release of Calabrese accelerated the return of the children to the company of Calabrese, plaintiffs cite no authority, and, we know of none, to suggest that this violated any right guaranteed them by the Constitution. Finally, we are not dealing with a governmental rupture of a family unit. The family unit that once was comprised of Leonhard, Rochelle and their children, had already been ruptured by Leonhard and Rochelle. Upon their divorce, Leonhard was deprived of custodial rights and was awarded only visitation rights. All of this occurred well in advance of the involvement of the federal defendants in the lives of the children.
 
 
 57
 The crux of the children's claim is simply that they were placed beyond the reach of their father. The fact that this occurred without a hearing did not implicate the children's constitutional rights because it was done in the course of the defendants' official duties, was done for the protection of the children, and was done with Rochelle's consent.
 
 
 58
 The most critical fact in determining whether the rights of the children were violated is the fact that Rochelle had sole custody of them. She was the parent who had been entrusted with their care, their education, their health and safety. There is no question that Rochelle consented to the removal and concealment of the children, nor that they remained in her custody for the entire time that they were concealed from their father. It is to be presumed that she was properly concerned for their welfare. See Parham v. J.R., 442 U.S. 584, 602-03, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101 (1979). There is no indication in her affidavit, nor any suggestion by the plaintiffs, that this was not so. And surely the presumption is reinforced by the circumstances, which were instinct with the risk of harm to the children the minute Calabrese became a potential witness against organized crime figures; the risk would increase substantially when the fact that Calabrese might testify became known to the accused criminals, as the children could become targets of premonitory or retaliatory acts, or could be the incidental victims of acts directly against Calabrese. It was Rochelle's right and her duty to weigh the interest of the children in being available for periodic visits from their father against their exposure to possible kidnapping or bodily harm. Her decision appears to be unassailable.
 
 
 59
 It is also important to note that the officials involved were attempting to carry out two official functions: first, to stamp out organized crime, and second, to protect witnesses, and the families of witnesses, who would testify or had testified against members of organized crime. There is no question that the officials' decision to remove and conceal Rochelle and the children was made in pursuit of these functions. The plaintiffs' attorney described the decision as part of "their efforts to deal with a very serious problem, organized crime, and to make an agreement, a deal, with a government informant." In deciding to protect the family of such an informant the officials must be entitled to rely on the consents of the family members to be removed and concealed. The Leonhard children, of course, were not old enough to make such decisions for themselves; their ages ranged from three to seven. Had they been old enough to make their own decisions, the officials could have relied on their consents and the children would obviously have no claim against those officials. Given their actual infancy, their mother made the decision. The fact that the decision was made by only one parent rather than both[28] is of no legal consequence since custody resided solely with the consenting parent. See Parham v. J.R., supra, 442 U.S. at 589, 99 S.Ct. at 2497 and passim; Boone v. Wyman, 295 F.Supp. 1143 (S.D.N.Y.) (Mansfield, J.), aff'd, 412 F.2d 857 (2d Cir. 1969), cert. denied, 396 U.S. 1024, 90 S.Ct. 600, 24 L.Ed.2d 518 (1970). See also Duchesne v. Sugarman, supra. Thus we conclude that the federal officials' removal and concealment of the children on the consent of their mother and sole custodian, did not violate the children's constitutional rights; given the fact of Rochelle's consent, no hearing as to the rights of the children was required.
 
 
 60
 Indeed, considering the uncivilized nature of the risks against which the removal and concealment of the children sought to forfend, it is difficult to envision the possibility of a hearing, either before or after the fact, which would be "useful ( ) . . . in the given circumstances," and which would not entail "adverse consequences." See Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1278 (1975). If a hearing had been held prior to the removal and concealment of the children, and Calabrese either remained willing to testify or the alleged criminals believed, even erroneously, that there remained any possibility that he would testify, the children would be exposed to the danger of abduction or other harm as leverage against Calabrese to prevent his testimony. A hearing after Calabrese testified could hardly be more meaningful since it would expose the children to the danger of retaliatory acts, undoubtedly designed in part to discourage other potential witnesses against organized crime. And, as we have discussed above, for the government officials to reveal the whereabouts of the children after testimony has been given and before the officials feel the dangers have abated would be the very essence of bad faith. We are thus compelled to conclude that due process did not require a hearing on the decision by Rochelle and the government officials to remove and conceal the children.
 
 
 61
 This conclusion finds support in the recent decision of the Supreme Court in Parham v. J.R., supra. Involved there was the question whether the state could constitutionally rely on a decision by a child's parent or guardian to commit the child to a mental institution without a hearing before or after the commitment. The Court held that despite the child's substantial liberty interest in not being confined, he has no constitutional claim when his parent or guardian has decided that he should be placed in a mental hospital and the hospital psychiatrists have determined that he needs treatment. Id. at 606-13, 99 S.Ct. at 2506-2510. The liberty interest in Parham was clearly more substantial than the interest of the children here in the possibility of periodic visits from their father. And the effect of the parents' decision in Parham, i. e., the complete removal of the child from any family environment, was far more drastic than the effect here of the children's relocation accompanied by their mother. Since, as was held in Parham, a child has no right to a hearing when his parent decides to obtain needed medical treatment for him by transferring him from the family to the confinement of a mental institution, a fortiori children have no cause to complain when their custodial parent and the government officials charged with such functions decide to protect their safety by relocating and concealing them, with their parent.[29] If the more drastic intrusion does not require a hearing, surely the less drastic intrusion does not.
 
 
 62
 In sum, since "(w)hat process is constitutionally due cannot be divorced from the nature of the ultimate decision that is being made," id. at 608, 99 at 2507, we conclude that the officials' exercise of their discretion and their reliance on Rochelle's consent to the removal and concealment of the children to protect them from organized crime, did not deny the children due process of law.[30] The children's constitutional claims were properly dismissed.
 
 B. The State Defendants
 
 63
 The single assertion against the state defendants is that two state agencies, the Department of Correctional Services and the Parole Board, and certain of their officials, released Calabrese from custody in violation of the law. The children's complaint against these defendants under 42 U.S.C. § 1983 was properly dismissed on grounds of immunity and failure to state a claim.
 
 
 64
 To the extent that the children assert claims for damages against agencies of the state,[31] they run squarely into the barrier of the Eleventh Amendment. It is well established that that Amendment bars a suit for damages absent the state's consent. Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); see Monell v. Department of Social Services, 436 U.S. 658, 690 n.54, 98 S.Ct. 2018, 2035, n.54, 56 L.Ed.2d 611 (1978). While the Eleventh Amendment may permit certain types of prospective injunctive relief, Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), we find no demand for injunctive relief against the state defendants in this action.
 
 
 65
 Moreover, even assuming that the release of Calabrese violated state law and that the removal of the children violated their constitutional rights, no claim upon which relief can be granted has been stated against either the state agencies or the state officials. Although the complaint asserts that in releasing Calabrese the state defendants acted "in concert with" the federal defendants, it is not alleged that any of these defendants participated in the removal or concealment of the children from Leonhard. Any connection between the mere release of Calabrese and the injuries alleged would be far too tenuous to support a claim against these defendants. See Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); Sostre v. McGinnis 442 F.2d 178, 189-90 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).
 
 C. Giambrone and the City of Buffalo
 
 66
 Giambrone, unlike the state defendants, is alleged to have participated in the removal and concealment of the children. He is alleged to have done so "under and by the full authority of" the City of Buffalo. For the reasons stated in part A above, however, the complaint fails to state a claim against Giambrone and the City for violation of the children's constitutional rights.
 
 
 67
 Moreover, even if a viable constitutional claim had been asserted against Giambrone, the dismissal of the action against the City would have been proper because the complaint does not allege that Giambrone acted pursuant to any official policy, regulation or custom of the city. A municipality cannot be held liable on a § 1983 claim under a respondeat superior theory; it is liable only if federal rights are violated pursuant to its official policy or custom. Monell v. Department of Social Services, supra, 436 U.S. at 663 n.7, 98 S.Ct. at 2022; Monroe v. Pape, supra. The assertion that Giambrone acted on the "authority" of the City is merely an allegation of agency, and is insufficient to support a claim against the City.
 
 V. THE CHILDREN'S OTHER CLAIMS
 
 68
 In addition to their constitutional claims, the children assert certain non-constitutional claims under the Tucker Act, the Federal Tort Claims Act[32] and common law.[33]
 
 A. Tucker Act Claim
 
 69
 The children's Tucker Act claims are that the Attorney General of the United States, knowing that Calabrese was a convicted felon, consigned the children to the company and association of Calabrese, who caused them mental and physical harm. The children claim that the Attorney General thereby violated the Organized Crime Control Act, and each child seeks damages from the United States under the Tucker Act in the amount of $10,000. Their claim is fatally flawed in several respects.
 
 
 70
 The United States, of course, "is immune from suit save as it consents to be sued." E. g., United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). The Tucker Act, 28 U.S.C. § 1346(a)(2) (1976), gives the district courts jurisdiction over civil actions "against the United States, not exceeding $10,000 in amount, founded . . . upon . . . any Act of Congress." This section, however, is merely a jurisdictional provision; "it does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398, 96, 948, 953, 47 L.Ed.2d 114 (1976). In order to determine whether any substantive right exists, we must look to the Act of Congress relied on, to find a clear waiver of sovereign immunity. "And it has been said, in a Court of Claims context, that a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.' United States v. King, 395 U.S. (1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)); Soriano v. United States, 352 U.S. 270, 276 (, 77 S.Ct. 269, 1 L.Ed.2d 306) (1957)." United States v. Testan, supra, 424 U.S. at 399, 96 S.Ct. at 954-55.
 
 
 71
 The substantive statute relied on by the children is the Organized Crime Control Act (the "Act"). This Act authorizes the Attorney General to provide for the health, safety and welfare of prospective witnesses, and their families, expected to be called to testify against alleged members of organized crime, whenever in the Attorney General's judgment, such testimony or willingness to testify would place in jeopardy the life or person of the prospective witness or his family. Pub.L. 91-452, Title V, §§ 501-504, 84 Stat. 933 (Oct. 15, 1970).[34] The initial problem with the children's claim is that the Act contains no suggestion that Congress intended to waive the government's immunity to a suit for failure to provide protection against reprisals or to create any private right of action for such a failure.[35] Moreover, even if some right of action were inferable, it could not be presumed that Congress intended to permit members of the family of the witness to sue the United States for injuries inflicted upon them by the witness. The risk that the witness may thereafter abuse members of his family is simply not one of the dangers sought to be eliminated by the Act. Finally, the Act was not in effect at the pertinent times. The children were removed and first given new identities in 1967; and according to Rochelle's affidavit, the government's participation in their concealment ended in July 1970. The Organized Crime Control Act was not passed until October 15, 1970. There is no indication that Congress intended to create any rights in favor of the family of a witness who had already testified in the past and had been shielded from organized crime for as long as the government felt necessary.
 
 
 72
 For all of these reasons, the Tucker Act claims were properly dismissed.
 
 B. Tort Claims Against the United States
 
 73
 The children's tort claims against the United States are somewhat similar to their Tucker Act claims. They allege that in arranging for the release of Calabrese and undertaking to conceal and support the children, the government undertook a duty to protect them from mental and physical harm. Reading the complaint in conjunction with the plaintiffs' administrative claim forms, it appears that the children claim that the United States negligently breached this duty by allowing them to be assaulted, battered, deprived of proper care and education, and mentally abused, by Calabrese. Each of the children seeks $500,000 in damages from the United States under the Tort Claims Act, 28 U.S.C. § 2674 (1976).
 
 
 74
 For tort claims, as for contract or statutory claims, the United States may be sued only to the extent that it has waived its sovereign immunity. The waiver for tort claims is limited both in substantive scope and in duration. The temporal constraints that Congress has placed on the government's vulnerability to tort suits are found in 28 U.S.C. § 2401(b) (1976). Section 2401(b) provides in pertinent part that "(a) tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ."[36] It is firmly established that the two-year period is not tolled by a claimant's minority. E. g., Smith v. United States, 588 F.2d 1209, 1211 (8th Cir. 1978); Simon v. United States, 244 F.2d 703 (5th Cir. 1957); United States v. Glenn, 231 F.2d 884 (9th Cir.), cert. denied, 352 U.S. 926, 77 S.Ct. 223, 1 L.Ed.2d 161 (1956); Hoch v. Carter, 242 F.Supp. 863 (S.D.N.Y.1965).
 
 
 75
 The children's tort claims were filed with the government on June 27, 1977. The effect of the two-year limitation provided by § 2401(b) is thus to bar recovery by the children on any tort claim that accrued prior to June 27, 1975. To the extent that their tort claims against the United States accrued prior to that date, they were properly dismissed for lack of jurisdiction.
 
 
 76
 It is unclear whether this disposition leaves any tort claims for the children to prosecute against the United States.[37] Rochelle's affidavit states that the children lived with Calabrese only "until June 1975," and does not specify the date their cohabitation ceased. The complaint asserts that Calabrese unlawfully imprisoned the children until July 4, 1975. Even on the assumption that Calabrese may have falsely imprisoned the children at any time between June 27, 1975 and July 4, 1975, however, the Tort Claims Act bars the children's recovery on such a claim.
 
 
 77
 With certain exceptions, the United States has consented to be liable for its torts only "to the same extent as a private individual under like circumstances."[38] 28 U.S.C. § 2674. Thus, it has not consented to be liable for injuries which its negligence has not proximately caused. See, e. g., Beesley v. United States, 364 F.2d 194 (10th Cir. 1966); United States v. Shively, 345 F.2d 294 (5th Cir.), cert. denied, 382 U.S. 883, 86 S.Ct. 177, 15 L.Ed.2d 124 (1965); United States v. Hutchins, 268 F.2d 69 (6th Cir. 1959). Both the character and the timing of the events alleged require a dismissal of the children's claims. The government acts complained of are arranging the release of Calabrese and arranging for the children to live with him. The charge, of course, ignores the facts that Rochelle had custody of the children and that she was married to Calabrese. The government did not impose the requirement that the children live with Calabrese; they were already part of the same family unit and had lived together prior to Calabrese's imprisonment. Moreover, despite the reiteration by plaintiffs that Calabrese was a convicted felon, there is no evidence in the record to suggest that he had a history of child abuse or neglect; the crime for which he was imprisoned was robbery.[39] And in any event, the protection of family members from each other is not the kind of duty assumed in the program to protect government informers who testify against organized crime. Finally, although the acts of Calabrese which may form the basis for the tort claims against the government may have occurred between June 27, 1975 and July 4, 1975, the last overt act of the government occurred half a decade earlier: Rochelle's affidavit reveals that the government's last acts in supporting and concealing the children occurred in July 1970.
 
 
 78
 Thus we find the acts of the government in arranging Calabrese's release in 1968, and concealing him and the children through July 1970 to protect them from reprisals by organized crime, too remote from the claims that in 1975 Calabrese unlawfully imprisoned the children. See W. Prosser, Handbook of the Law of Torts § 51, at 322 (3d ed. 1964); cf. Martinez v. California, supra.
 
 
 79
 Finally, the United States cannot be held liable for failure to continue to support the children and Calabrese past 1970 or to conduct minute supervision over their daily lives. Such decisions are clearly matters of discretion, and the government has not consented to
 
 
 80
 (a)ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 81
 28 U.S.C. § 2680(a) (1976).
 
 C. Tort Claims Against Others
 
 82
 The complaint contains one common law tort claim on behalf of the children against certain unidentified individuals. It is asserted that these individuals abducted the children from Leonhard in August 1967 and continued to harbor them from him until July 1975.[40] The claim does not appear to be sustainable.
 
 
 83
 It is clear that in 1967 Rochelle had lawful custody of the children; Leonhard did not have custody but only visitation rights. It is also clear that Rochelle consented to the removal and concealment of the children, along with the removal and concealment of herself, and that the children always resided with her. Her affidavit makes it clear beyond cavil that her, and the children's, removal and concealment were entirely voluntary. In these circumstances the children have no claim for abduction or false imprisonment.[41] See, e. g., Restatement (Second) of Torts § 700, comment c (1976); id. § 892A, comment b (1977); id. § 703, comments a, e (1976). Cf. Dale v. State, 44 A.D.2d 384, 355 N.Y.S.2d 485 (3d Dep't 1974), aff'd mem., 36 N.Y.2d 833, 331 N.E.2d 686, 370 N.Y.S.2d 906 (1975); Anonymous v. State, 17 A.D.2d 495, 236 N.Y.S.2d 88 (3d Dep't), leave to appeal denied, 13 N.Y.2d 598, 245 N.Y.S.2d 1025, 194 N.E.2d 836 (1963).
 
 CONCLUSION
 
 84
 The dismissals of all claims are affirmed. We instruct the Clerk of the district court to correct the September 24, 1979, judgment nunc pro tunc in accordance with the November 19, 1979, instructions of the district judge.
 
 
 85
 No costs.
 
 
 
 [1]
 The decree was entered in Leonhard v. Leonhard, No. C-94314 (N.Y.Sup.Ct. Erie Co. Sept. 29, 1966), and provides in relevant part:
 (It is) ORDERED that the plaintiff (Rochelle) have custody and control of the children of the marriage, MICHAEL LEONHARD, KAREN LEONHARD and STEPHEN LEONHARD, and it is further
 ORDERED that the defendant (Thomas) be permitted visitation rights with the children on Sundays between ten and six and three days during the summer vacation of the defendant and on alternate holidays agreed upon between the parties, and it is further
 ORDERED that the defendant pay to the plaintiff the sum of forty-five dollars ($45.00) per week for the support and maintenance of the children of the marriage and defendant to provide Blue Shield/Blue Cross.
 
 
 [2]
 Transcript of hearing, June 11, 1979. Plaintiffs' brief to this Court on the present appeal also states that Rochelle telephoned Leonhard's attorney on July 4, 1975
 
 
 [3]
 Paragraph 1 of the complaint also mentions injunctive relief. However, the complaint nowhere specifies which defendants are sought to be enjoined to do, or forbear from doing, what acts. The final paragraph of the complaint is a general prayer "for judgment declaring unlawful the actions of defendants complained of herein."
 
 
 [4]
 In addition to these allegations, the complaint contains a section denominated "Parties," in which various government officials including past and present Attorneys General of the United States, United States Marshals and others are described as having formulated procedures and "initiate(d)" the actions complained of
 
 
 [5]
 Each child demands damages of $10,000 under the Tucker Act, 28 U.S.C. § 1346(a)(2), plus $500,000 under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
 
 
 [6]
 It appears that plaintiffs submitted Kennelly's affidavit for the purpose of comparing the issues here with those decided in Leonhard I, rather than for the truth of its statements
 
 
 [7]
 We infer that Rochelle is now estranged from Calabrese. Her affidavit, which she executed under the name Rochelle Leonhard, states that she and the children lived with Calabrese from 1968 until June 1975. She states that she now lives in Nevada. The complaint asserts that Calabrese resides in Seattle, Washington
 Rochelle's affidavit recounts, inter alia, the moves that she and the children made after their initial removal from New York in 1967, the names they assumed, and the extent to which the government participated in their concealment and support. See note 20 infra.
 
 
 [8]
 Rule 54(b) provides:
 Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 
 
 [9]
 If the court is given reason to believe that it is premature to assume that service will not be made on absent parties, it can of course direct that judgment reflecting the dismissal of the parties served not be entered until further order of the court. See Fed.R.Civ.P. 58, quoted in note 16 infra
 
 
 [10]
 But see dictum in Lyford v. Carter, 274 F.2d 815, 815 n. 1 (2d Cir. 1960), suggesting that a dismissal even as to unserved defendants is a prerequisite to appeal, but construing the dismissal to have applied to all named defendants. The opinion in Ferguson v. Bartels Brewing Co., supra, 284 F.2d at 857, points out that the Lyford statement "was not necessary to decision." (Footnote omitted.)
 
 
 [11]
 Neither the defendants nor the plaintiffs have voiced any objection to the fact that the claims against Giambrone were dismissed without his ever having moved for such relief. We note, however, that Giambrone's answer pleaded, inter alia, statute of limitations, and absence of malice or deceit, and prayed for judgment dismissing the complaint. The district court has the power to dismiss a complaint sua sponte for failure to state a claim, Robins v. Rarback, 325 F.2d 929 (2d Cir. 1963), cert. denied, 379 U.S. 974, 85 S.Ct. 670, 13 L.Ed.2d 565 (1965); see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357, at 593 (1969). There appears to be no reason why the same rule should not apply to a dismissal on statute of limitations grounds, at least where, as here, the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted. See 10 id. § 2719
 
 
 [12]
 Fed.R.Civ.P. 60(a) provides as follows:
 Clerical Mistakes. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.
 If the present appeal had not been docketed in this Court, the district court would have had the power to cause the correction to be made. Or if an appeal had been taken from an appealable order, thus giving us jurisdiction, we could authorize the correction to be made. The question whether the docketing of an attempted appeal from a non-appealable order deprives the district court of jurisdiction to make the clerical correction is part of the broader question whether the filing of a spurious appeal affects the district court's jurisdiction at all.
 
 
 [13]
 Professor Moore describes the problem as follows:
 The problem was created by the elimination in 1937 of petition and allowance of appeals in favor of the simple filing of the notice. It seems likely that the draftsmen of former Civil Rule 73(a) had in mind the simplification of appellate procedure by the elimination of a step that was looked upon as pro forma. Former Civil Rule 73(a) and present Rule 3(a) provide the procedure for "an appeal permitted by law." Such an appeal may be "taken" by filing a notice of appeal. An appeal not permitted by law may not be "taken" at all, and the court of appeals requires no jurisdiction of it. If the court of appeals acquires no jurisdiction, it seems to follow that the district court loses no jurisdiction that it otherwise would have. Of course the court of appeals has jurisdiction to determine its jurisdiction, and the district court cannot interfere with that. To hold, however, that the mere invocation of the jurisdiction of the court of appeals when it is obvious that it has none, will stay all proceedings in the district court, appears to be a most inefficient way to manage the case.
 
 
 [9]
 Moore's Federal Practice P 203.11, at 3-51 to 3-52 (1980) (footnotes omitted; emphasis in original)
 
 
 [14]
 But see Gumer v. Shearson, Hammill & Co., 516 F.2d 283, 285 (2d Cir. 1974), stating that "(t)echnically, we could dismiss the appeal on the ground that the district court had no jurisdiction to enter the Rule 54(b) certificate after the appeal had been taken" from a non-final order, but declining to do so
 
 
 [15]
 See also Fed.R.App.P. 4(a)(2), which, as amended effective August 1, 1979, provides that except in circumstances not applicable here, "a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof."
 
 
 [16]
 Rule 58 provides:
 Subject to the provisions of Rule 54(b): (1) upon a general verdict of a jury, or upon a decision by the court that a party shall recover only a sum certain or costs or that all relief shall be denied, the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court; (2) upon a decision by the court granting other relief, or upon a special verdict or a general verdict accompanied by answers to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it. Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a). Entry of the judgment shall not be delayed for taxing of costs. Attorneys shall not submit forms of judgment except upon direction of the court, and these directions shall not be given as a matter of course.
 
 
 [17]
 We do not, therefore, reach the other grounds relied on by the district court for dismissal of Leonhard's claims
 
 
 [18]
 There is some disagreement as to just when in 1967 Rochelle and the children were in fact removed from New York: Leonhard places the date at about August 15, the date on which he first attempted to visit the children and was unable to find them; Kennelly's affidavit states that the first move took place in June; and Rochelle's affidavit states that they were first moved in February. Whether the actual date of removal was the date that Leonhard first discovered his loss or was one of the earlier dates is immaterial in the present circumstances. This would be so even if, contrary to our conclusion, the cause of action were deemed not to have accrued until discovery by Leonhard that his children were gone, see Birnbaum v. United States, 588 F.2d 319, 335 n.31 (2d Cir. 1978), rather than upon their removal. See note 19 infra
 
 
 [19]
 Leonhard also argues that the statute did not commence to run until 1975 because of fraudulent concealment. Apparently he argues that he was told by defendants that his children were being properly cared for and did not learn until 1975 that they were being mistreated. He also appears to claim, although it is far from clear, that the defendants told him that the children were in danger, when in fact they were not in danger. For the latter proposition he refers to Rochelle's affidavit which states, in part, that
 according to all reports received by affiant from agents of the City of Buffalo and agents of the Justice Department of the United States, neither she nor her children were in any danger from persons involved in organized crime as a result of testimony of PASCAL CALABRESE on behalf of the United States.
 It is difficult to know what to make of this statement. It does not indicate that Rochelle was unconcerned for the children's safety; it does not contradict Kennelly's affidavit submitted in Leonhard I detailing Rochelle's insistence that their whereabouts not be disclosed. And the affidavit in no way suggests that at the time Rochelle agreed to the relocation of herself and the children, any defendant falsely represented to her that she or the children were in danger. What seems clear, however, is that neither Rochelle's affidavit nor any other facts presented by plaintiffs supports resort to the doctrine of fraudulent concealment. This federally created doctrine in some circumstances allows an effective tolling of the statute of limitations if the existence of a cause of action has been fraudulently concealed from the holder of the claim. See United States v. Diamond Coal & Coke Co., 255 U.S. 323, 41 S.Ct. 335, 65 L.Ed. 660 (1921); Exploration Co. v. United States, 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200 (1918); Bailey v. Glover, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1875). See generally Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80 (2d Cir.), cert.denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). Leonhard's cause of action was for the termination of his relationship with his children. (Not being their custodian, he had no right to recover for injuries they may have suffered. See Restatement (Second) of Torts § 703, comment e.) There is no question here that Leonhard learned of the removal and concealment of the children as early as August 1967. He brought suit to compel disclosure of their whereabouts in July 1971 (see note 26). Any claim that his cause of action was concealed from him until 1975 is specious.
 
 
 [20]
 Paragraphs 6-9 of Rochelle's affidavit state as follows:
 SIXTH: That at certain times relevant to this action PASCAL CALABRESE was a paid informant and agent for, and was under the control of the Justice Department of the United States.
 SEVENTH: That your affiant and her children resided with PASCAL CALABRESE after being removed from Buffalo, New York, by agents of the United States Department of Justice and the City of Buffalo. They were relocated with the assistance of the United States Government and lived in Loring Air Force Base, Caribu, Maine under the assumed name of CAPT. PATRICK ANDREWS from February 1967 to March 1968; and resided in Bel Aire, Maryland, under the assumed name of ANGELO from June 1968 to August 1968; and, resided in Ann Arbor, Michigan, and its surrounding areas under the assumed name of ANGELO from August 1968 to July 1970.
 EIGHTH: That throughout this period the federal government provided monetary, financial and employment assistance to PASCAL CALABRESE.
 NINTH: That from July 1970 to the present, MICHAEL, KAREN, and STEPHEN LEONHARD have resided in Reno, Nevada, with affiant, using the assumed name of CALA until about July 1975.
 
 
 [21]
 An intermediate possibility would be February 1968, when Rochelle and the children were relocated by the government following Calabrese's release from prison
 
 
 [22]
 42 U.S.C. § 1983 provides as follows:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [23]
 But see footnote 6 of the Quinn opinion, noting that recent developments suggest the applicability of New York's six-year statute for actions not otherwise provided for, on the ground that § 1983 itself does not impose liabilities but merely provides additional remedies. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); State v. Cortelle Corp., 38 N.Y.2d 83, 85, 378 N.Y.S.2d 654, 655, 341 N.E.2d 223, 224 (1975). We need not explore this possibility here since either the three-year or the six-year period would bar Leonhard's claim. See also Board of Regents v. Tomanio, supra, 446 U.S. at ---- n.4, 100 S.Ct. at 1795
 
 
 [24]
 This claim and the children's claim against Giambrone assert that throughout the period from 1967 to 1975, Leonhard was the legal guardian and custodian of the children. These allegations are contradicted by plaintiffs' brief on appeal and by records of which we may take judicial notice. Plaintiffs' brief on this appeal indicates that it was not until June 1971 that Leonhard obtained a court order stating that he had custody of the children. This is substantiated by Leonhard's amended petition for mandamus in Leonhard I, which also stated that the 1966 divorce decree had given Rochelle custody with Leonhard having merely visitation rights. A certified copy of the divorce decree is part of the record in Leonhard I and is quoted in note 1, supra
 Finally, there is substantial question whether the New York Supreme Court order obtained by Leonhard in June 1971 was effective to give him custody of the children. The order was obtained by default, and according to Rochelle's affidavit she and the children resided in Nevada at that time. In the absence of both Rochelle and the children from the state it does not appear that the New York court had jurisdiction to affect the custody of the children. See May v. Anderson, 345 U.S. 528 (1953); Restatement (Second) of Conflicts of Laws § 79 (1969).
 
 
 [25]
 As to the children's ages we rely on Rochelle's affidavit. There is about a one-year discrepancy between Rochelle's affidavit and the administrative claim forms as to each of the children's ages. The difference is of no legal consequence here
 
 
 [26]
 There appears to be some force to the argument that Leonhard has asserted in both actions the same claims of wrongdoing by the defendants, the same invasions of his rights, and the same legal basis for his claims, and that only the relief prayed for is different. Thus, although Leonhard contends that he never raised in Leonhard I the issues raised here, "namely, separation, removal and concealment," (e. g., Brief at 23), his amended petition for mandamus in Leonhard I alleged inter alia that the defendants caused the children to be "secreted in a location unknown to" him (P 3F), and "have consistently refused to divulge" their whereabouts (P 5), that the defendants were "responsible for this deprivation of custody and for the separation of (Leonhard) from his children" (P 3L), and that by reason of defendants' acts Leonhard "was deprived of his liberty to see and communicate with his children and now is effectively deprived of custody of his children in violation of the Fifth Amendment of the Constitution's requirement of due process." (P 4B.)
 Nevertheless, the relief sought in Leonhard I, mandamus to compel disclosure, was different from the present claim for damages. While there appears to have been no reason that Leonhard could not have sued for damages at the same time that he sought mandamus, see Fed.R.Civ.P. 18; Crawford v. Cushman, 531 F.2d 1114, 1126 (2d Cir. 1976); Restatement (Second) of Judgments §§ 61, 61.1 (Tent.Dr.No. 5, 1978), the nature of the relief sought by the mandamus petition called into question a duty different from that which is fundamental to the present case. In Leonhard I the issue was simply whether the defendants could be ordered, at that time, to disclose the children's whereabouts, and the principal question was whether the decision not to disclose was within the defendants' discretion. Given our view that the subsequent concealment of the children follows virtually automatically upon the initial undertaking to protect them, see part III. A. supra, it would seem harsh to hold that an unsuccessful suit to terminate the subsequent concealment barred pursuit of the more appropriate claim to redress their wrongful removal.
 
 
 [27]
 It is not clear to what extent plaintiffs seek to assert these claims against government agencies as well as individuals. We note that all of the claims against the federal agencies were properly dismissed, because Congress has not waived their sovereign immunity. See Kessler v. General Servs. Adm., 341 F.2d 275 (2d Cir. 1964); Gnotta v. United States, 415 F.2d 1271, 1277 (8th Cir. 1969) (Blackmun, J.), cert. denied, 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970). It is immaterial that the defense of sovereign immunity was not expressly raised by the agencies below nor pressed by them on this appeal. Since sovereign immunity is a jurisdictional defect, see United States v. Sherwood, 312 U.S. 584, 587-88, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941), it can be raised at any time, see Fed.R.Civ.P. 12(h)(3), and indeed by a court of appeals on its own motion. Hill v. United States, 571 F.2d 1098, 1100 (9th Cir. 1978); Armstrong v. United States, 283 F.2d 122, 123 (3d Cir. 1960). Cf. Alabama v. Pugh, 438 U.S. 781, 782 n.1, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978); Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974)
 
 
 [28]
 Certainly if both Rochelle and Leonhard had consented the children would have no claim
 
 
 [29]
 It could be argued that Parham can be distinguished because the need for medical treatment was determined by psychiatrist factfinders who were neutral, whereas here the federal officials who decided to remove and conceal the children were "interested" in their protection, in the sense that only by protecting them could they obtain the testimony they desired. We do not view this as a significant difference because the dangers to the children were inherent in the very circumstances of Calabrese's willingness to testify against members of organized crime
 
 
 [30]
 As to some of the federal defendants, the complaint was properly dismissed for the additional reason that they were not alleged to have participated personally in the removal and concealment of the children. Some, e. g., defendant Griffin Bell, were not in office at the time the children were removed. See 429 U.S. iv n.2, 97 S.Ct. 5 n.3, 50 L.Ed.2d IX n.1. Some are alleged merely to have been supervisors-e. g., defendant Gerald Shur is alleged generally to have formulated and implemented procedures and methodology. Public officials may be held responsible only to the extent that they caused the plaintiff's rights to be violated; they cannot be held liable for violations committed by their subordinates or predecessors in office. Johnson v. Glick, 481 F.2d 1028, 1033-34 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); Sostre v. McGinnis, 442 F.2d 178, 189 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972)
 
 
 [31]
 As noted earlier, the assertions against the state defendants are found in the complaint's description of the parties rather than in any of the twelve separately stated claims for relief. It appears that plaintiffs nevertheless intended to assert claims against these defendants. However, at the hearing below, they requested permission, in light of recent authority, to withdraw their claims against the state agencies. There appears to have been no good reason for the district court to grant this permission rather than pursuing the course actually followed, of dismissing the claims
 
 
 [32]
 Despite a casual paragraph in plaintiffs' brief suggesting to the contrary, the complaint does not appear to assert a Tort Claims Act claim on behalf of Leonhard. Leonhard appears to contend in his brief, without significant elaboration, that such a claim has been asserted on his behalf (Brief at 32, 55), and an administrative claim was indeed filed with the Department of Justice claiming that the removal and concealment of the children caused him "severe mental, physical, and emotional injury and damages" in the amount of $1,500,000. To the extent that the complaint intended to assert a tort claim on Leonhard's behalf it failed because the only cause alleged on his behalf against any federal defendants expressly recognizes that the acts performed were discretionary. Suit would thus be barred under 28 U.S.C. § 2680(a) which prevents claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused." Further, even if such a claim were permitted, it would be barred by the two-year period of limitations provided by 28 U.S.C. § 2401(b), since, for the reasons stated above, Leonhard's claims arose not later than 1970
 
 
 [33]
 Several such claims are asserted against Calabrese for torts allegedly committed against one or more of the children. We express no view on these claims since Calabrese was never served and did not appear
 
 
 [34]
 The Act provides as follows:
 Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.
 Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.
 Sec. 503. As used in this title, "Government" means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.
 Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.
 
 
 [35]
 This may not, however, leave the witness without remedy for injuries suffered as a result of reprisals for his assistance to the government. If there was an express or implied contract for his protection the United States would be amenable to suit for its breach, either in a district court if the claim was for $10,000 or less, or in the United States Court of Claims. 28 U.S.C. §§ 1346(a)(2), 1491. Or, a claim that the government was negligent in failing adequately to protect the witness from reprisals might be brought in district court under the Tort Claims Act. See Swanner v. United States, 309 F.Supp. 1183 (M.D.Ala.1970). See part V. B. infra
 
 
 [36]
 Section 2401(b) also provides that such a claim is barred "unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." Section 2675(a), a provision of the Tort Claims Act which prohibits suit unless a claim has been finally denied by the appropriate agency, provides that "(t)he failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." The government has never responded to the tort claims filed by the plaintiffs in 1977. Hence the six-month provision of § 2401(b) does not impede the present suit. See Mack v. United States Postal Service, 414 F.Supp. 504, 506-08 (E.D.Mich.1976)
 
 
 [37]
 Two claims that Calabrese assaulted Karen Leonhard assert that those assaults occurred in 1970 and February 1975. To the extent that these alleged acts form the basis for tort claims against the United States, such claims are time-barred
 
 
 [38]
 Certain limitations on this vulnerability are included in § 2674 itself, e. g., the government is not liable for punitive damages. Other exceptions to the government's liability are carved out in § 2680, e. g., the government is not liable for the intentional torts of its employees
 
 
 [39]
 These facts distinguish cases in which the government was held accountable because it could easily have been expected, knowing the history or character of the perpetrator of the assault, to foresee the assault which occurred. See, e. g., United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (federal prisoner beaten by other prisoners); Downs v. United States, 522 F.2d 990 (6th Cir. 1975) (pilot killed by hijacker when FBI refused hijacker's demands); Rogers v. United States, 397 F.2d 12 (4th Cir. 1968) (probationer tortured while in custody of a person previously indicted for chaining and physically abusing another); Fair v. United States, 234 F.2d 288 (5th Cir. 1956) (decedents killed by psychotic officer released by Air Force). See also Swanner v. United States, supra (government informer's house bombed after he agreed to testify)
 
 
 [40]
 Paragraph 68 alleges as follows:
 On or about the 15th day of August, 1967, at 66 Normal Street, Upper, Buffalo, New York, and continuing up and until the 4th day of July, 1975, at 1575 Wedekind Street, Apartment C. Reno, Nevada, the defendant herein, and a number of unknown agents of the United States Department of Justice and United States Marshal's Service, Robert Dolon Peloquin, Dennis P. O'Keefe, James R. Richards, Robert C. Steward and Robert G. Ryan, did entice, abduct and harbor the plaintiffs, Michael, Karen and Stephan Leonhard, from their natural father, the plaintiff, Thomas Leonhard, and as a result the plaintiffs herein did suffer extreme shock, apprehension and mental and physical anguish and distress.
 Principles of pendent jurisdiction are invoked.
 
 
 [41]
 Technically, and with etymological soundness, it appears that at common law there is no cause of action for abduction on behalf of the child abducted; that claim belongs to the parent who had custody of the child. See generally W. Prosser, Handbook of the Law of Torts § 118, at 905-06 (3d ed. 1964). The abducted child's claim would be for false imprisonment. See Robalina v. Armstrong, 15 Barb. 247 (N.Y.Sup.Ct.Fulton Co.1852)
 The claim for abduction quoted in note 40 supra is asserted only on behalf of the children; no such claim has been asserted on behalf of Leonhard. It seems clear, however, that Leonhard could not prevail on an abduction claim because he was not entitled to custody of the children. See, e. g., Aberlin v. Zisman, 244 F.2d 620 (1st Cir.) (action by non-custodian father for abduction against child's maternal aunt and uncle dismissed, applying New York law, where aunt had been awarded temporary custody), cert. denied, 355 U.S. 857, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957); McGrady v. Rosenbaum, 62 Misc.2d 182, 308 N.Y.S.2d 181 (Sup.Ct.N.Y.Co.1970) (where child's mother has legal custody, father has no cause of action against mother's parents for aiding mother in keeping child away from father), aff'd, 37 A.D.2d 917, 324 N.Y.S.2d 876 (1st Dep't 1971). See also Pickle v. Page, 252 N.Y. 474, 169 N.E. 650 (1930) (sheriff who took child from its adoptive parents at the instance of the natural mother held liable for abduction).